IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN CHAMBERLAN; BRIAN CHAMPINE; and HENRY FOK, on behalf of themselves and all others similarly situated, and on behalf of the general public, | No. C 03-02628 CW |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS |
| v. | |
| FORD MOTOR COMPANY, and DOES 1 through 100, inclusive, | |
| Defendants. | |

_____/

Defendant Ford Motor Company moves for summary adjudication of all claims brought by Plaintiffs Susan Chamberlan and Henry Fok, on behalf of themselves and others similarly situated (collectively, Plaintiffs).  In the alternative, Defendant seeks summary adjudication of the claims of certain subsets of the class.  Defendant also moves for judgment on the pleadings of Plaintiffs' UCL claims on behalf of the general public.  Plaintiffs oppose these motions.[1]

The matters were heard on March 18, 2004.  Having

---

[1] Plaintiffs also object to the evidence offered by Defendant's experts.  See Docket No. 290, Objections by the Plaintiff Class to Evidence Offered by Defendant Ford Motor Company on its Motion for Summary Judgment.  To the extent that the Court relies upon evidence to which Plaintiffs object, their objections are overruled.  To the extent that the Court does not rely on such evidence, Plaintiffs' objections are overruled as moot.

United States District Court

For the Northern District of California

considered all of the papers filed by the parties and oral

argument on the motion, the Court grants in part and denies in

part Defendant's motion for summary adjudication, and grants

Defendant's motion for partial judgment on the pleadings.

BACKGROUND

Plaintiffs bring this action on behalf of themselves and

all similarly situated persons residing in California who

purchased certain automobiles manufactured by Defendant.[2]

Plaintiffs allege that, beginning in 1996, Defendant concealed

material information about the intake manifolds in these cars,

in violation of California law.

An intake manifold performs multiple functions in a

automobile engine.  The intake manifold distributes air to each

of the engine's cylinders.  The intake manifold may also serve

as part of the cooling system by channeling coolant across the

engine, to and from the radiator.  Historically, intake

manifolds have been made of aluminum or other metal.  Aluminum

manifolds can be expected to last the life of the engine.

Defendant had no problems with the performance of the water

crossover portions that distribute coolant in its aluminum

manifolds.  Solomon Decl., Ex. 3, Beatham Dep. 11:8-12.

The manifolds at issue in this case are composed entirely

of a non-metal nylon and glass composite material, i.e. plastic.

Defendant's first such manifold was described by Ford employees

_____

[2] The automobiles at issue include Mercury Grand Marquis
(1996-2001), Ford Mustang (1996-2001), Ford Explorer (2002),
Ford Crown Victoria (1996-2001), Lincoln Town Car (1996-2001),
Mercury Cougar (1996-1997), and Ford Thunderbird (1996-1997).

2

United States District Court

For the Northern District of California

as "the world's first V8 composite intake, and the first composite intake manifold to integrate a water crossover." Solomon Decl. Ex. 8, 4.6L-2v Composite Intake Action Plan & Lessons Learned, February 17, 1999, at 2.  The composite manifold was hailed as "the beginning of a major technology shift toward the use of plastics & composites on core engine applications yielding substantial cost and weight savings."  Id.

Defendant began using non-metal composite manifolds, with a thickness of three millimeters, in the water crossover pieces in 1996 model year vehicles, which were first available for sale in June, 1995.  Plaintiffs' earliest evidence that Defendant was aware of problems with the manifolds is a November 16, 1995 report that a taxicab and a police car (heavily used cars referred to as "fleet" vehicles) were experiencing coolant leaks.  Solomon Decl. Ex. 5, Nov. 16, 1995 Concern Detail at 1. Ford employee Gerald Czadzeck assigned engineer Wolfgang Beatham to evaluate the results of a material analysis and bench test fatigue simulation.  By June 6, 1996, Mr. Beatham estimated the part's failure rate to be as high as nineteen per thousand at 50,000 miles and 270 per thousand at 120,000 miles.  Id. at 3. This estimate did not reflect actual repair rates but rather was "something we expect to occur at higher mileage with the current production intake manifold."  Id. at 5.  According to Mr. Czadzeck, Mr. Beatham's estimates reflected the "potential risk of not correcting the problem" as "extrapolated to the general public" rather than just high-end fleet users.  Solomon Decl.,

3

United States District Court

For the Northern District of California

Ex. 4, Czadzeck Dep. 61:21-62:5.  Mr. Czadzeck characterized Mr. Beatham's estimates as "tremendously high failure rates."  Id. 62:7-9.  By August 28, 1997, internal Ford documents described both a "high number of wear out failures on the composite intake manifold on fleet customers and an increasing number of concerns on general population vehicles."  Solomon Decl. Ex. 12, Field Failures of Manifold Incorporated Engine Coolant Crossover Duct at 1.

Between 1996 and 2000, Defendant tried to fix the problem by making several changes to the design of the non-metal manifolds.  The first proposed solution was to add one millimeter of thickness to the water crossover parts; bench and finite element testing reportedly showed that this would reduce the projected warranty liability to zero at 120,000 miles.  Id. at 3.  This four millimeter "second generation" water crossover design was sold in 1997 model year vehicles.  For 1998 model year vehicles' third generation manifold design, Defendant increased the thickness to five millimeters.  Solomon Decl. Ex. 2, Riedel Dep. 31:7-11.  According to Ford documents, the "4 and 5 mm iterations each demonstrated significant improvements in durability, but neither met [Defendant's] 95 percentile customer durability requirements."  Composite Intake Action Plan & Lessons Learned, February 17, 1999, at 2.  Defendant later changed the nylon material "slightly" and made some design revisions after the third generation.  Riedel Dep. 33:5-17.

In December, 1997, in order to address field failures with the three millimeter coolant crossover, Defendant issued Owner

United States District Court

For the Northern District of California

Notification Programs (ONPs) to replace manifolds on Crown Victoria police vehicles, and extended warranties on Crown Victoria taxi, Thunderbird/Cougar and Mustang vehicles.  Solomon Decl., Ex. 13, Field Failures of Intake Manifold Incorporated Engine Coolant Crossover Duct, July 27, 2000, rev. April 5, 2001, at 1.  Similar ONPs were issued for four millimeter manifolds on fleet vehicles and some missed three millimeter vehicles.  <u>Id.</u>  These ONPs provided five millimeter replacements for car owners' three and four millimeter manifolds.  <u>Id.</u>

Defendant ultimately decided not to use all-plastic crossover designs in future vehicles.  <u>Id.</u> at 5.  The Ford team had agreed,

> [D]ue to the fact that our best evidence indicates that the failure is due to the accumulated effects of time, temperature and pressure in service; there is no reason to believe that the demand for service parts will increase linearly or flatten out.  In the lower severity duty cycles the vehicles built at or around job #1 are only now approaching the mileages where failures have occurred in the most severe fleet applications.  In all probability the light duty applications will continue to fail at ever increasing rates . . . .

Solomon Decl. Ex. 17, June 29, 2000 Email from Gary Liimatta to Thomas Zahm.  According to an October 20, 2000 email, approximately 8,000 intake manifolds were being replaced each month on 1996 to 2000 model year 4.6L-2v passenger cars.  Solomon Decl. Ex. 15, October 20, 2000 Email from Gregory Banish to Thomas Zahm.  Defendant never issued ONPs to members of the Plaintiff class.

Plaintiffs also provide evidence that class members were affected by Defendant's failure to alert them to problems with

their manifolds.  The named Plaintiffs and the other class members designated as witnesses all testify that they did not expect their manifolds to fail, and some testify that they would not have bought the cars had they known of the increased risk of failure.  <u>See, e.g.</u>, Solomon Decl., Ex. 29, Alton Dep. 90:8-24, 93:2-19.

Plaintiffs' expert Richard Greenspan also testified as to the high cost of replacing failed manifolds and the risk of engine failure.  <u>Id.</u>, Ex. 26, Greenspan Rep. 4-5, 8-10.  Mr. Greenspan also testified that a typical vehicle owner would not expect this part to fail.  <u>Id.</u>, Ex. 34, Greenspan Dep. 65-66.

In addition, Plaintiffs' experts have testified that all or most of class members' manifolds will eventually fail. According to Clemente Mesa, a mechanical engineer, ninety percent of class members' manifolds will fail before the end of the useful life of the car, and a majority of those will fail before 100,000 miles, regardless of which version of the intake manifold is used and regardless of whether the vehicle is used by retail or fleet customers.  Ram Decl., Ex. 1, Mesa Dep. 255-257.  Similarly, Dr. Anand Kasbekar, an expert in forensic engineering, testified that "all versions" of the plastic manifolds were defective in that they would not last the life of the vehicle.  Ram Decl., Ex. 2, Kasbekar Dep. 292:16-20.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is

6

clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.
56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986);
<u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th
Cir. 1987).

    The moving party bears the burden of showing that there is
no material factual dispute.  Therefore, the court must regard
as true the opposing party's evidence, if supported by
affidavits or other evidentiary material.  <u>Celotex</u>, 477 U.S. at
324; <u>Eisenberg</u>, 815 F.2d at 1289.  The court must draw all
reasonable inferences in favor of the party against whom summary
judgment is sought.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio
Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford
Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

    Material facts which would preclude entry of summary
judgment are those which, under applicable substantive law, may
affect the outcome of the case.  The substantive law will
identify which facts are material.  <u>Anderson v. Liberty Lobby,
Inc.</u>, 477 U.S. 242, 248 (1986).

    Where the moving party does not bear the burden of proof on
an issue at trial, the moving party may discharge its burden of
showing that no genuine issue of material fact remains by
demonstrating that "there is an absence of evidence to support
the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.  The
moving party is not required to produce evidence showing the
absence of a material fact on such issues, nor must the moving
party support its motion with evidence negating the non-moving
party's claim.  <u>Id.</u>; <u>see also Lujan v. Nat'l Wildlife Fed'n</u>, 497

United States District Court
For the Northern District of California

U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991), <u>cert. denied</u>, 502 U.S. 994 (1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409.  A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  <u>Celotex</u>, 477 U.S. at 323.

DISCUSSION

I.  Class CLRA and UCL Claims

    A.  Required Elements of CLRA Claim

As a threshold matter, the parties dispute the required elements of Plaintiffs' claim under the California Consumers Legal Remedies Act (CLRA), Cal. Civ. Code § 1750 <u>et seq</u>. Specifically, Defendant argues that Plaintiffs must show that disputes of material fact exist regarding certain elements of common law fraud tort claims, including whether Defendant owed Plaintiffs a duty and whether Defendant acted with an intent to deceive.  Plaintiffs argue that such tort elements are not required to state a claim under the CLRA, and that the Court decided as much in its August 6, 2003 Order on Defendant's motion to dismiss.

To establish a fraud tort claim based on failure to disclose a material fact, a plaintiff must prove, among other things, the existence of a duty of reasonable care and an intentional breach of that duty.  See <u>LiMandri v. Judkins</u>, 52

United States District Court

For the Northern District of California

Cal. App. 4th 326, 336 (1997) (outlining four circumstances in which non-disclosure may constitute actionable fraud); Restatement (Second) of Torts § 551 (setting forth potential grounds for tort liability based on non-disclosure).  Defendant argues that Plaintiffs' CLRA claims must also meet these common law fraud requirements, but the two cases it cites as authority fail to support this proposition.  In <u>Consumer Advocates v. Echostar Satellite Corp.</u>, the court, in evaluating whether certain statements constituted misrepresentation for purposes of a CLRA claim, noted that the statements were "akin to 'mere puffing,' which under long-standing law cannot support liability in tort."  113 Cal. App. 4th 1351, 1361 n.3 (2003) (citing <u>Hauter v. Zogarts</u>, 14 Cal. 3d 104, 111 (1975)).  While this suggests that tort standards at times may be relevant to a court's evaluation of CLRA actions, it falls far short of establishing that CLRA actions must fulfill the same elements as common law fraud claims.  Similarly, in an unpublished decision in <u>Vess v. Ciba-Geigy Corp. USA</u>, 2001 WL 290333, at *10 (S.D. Cal. March 9, 2001), the court found that CLRA claims sound in fraud and therefore must be plead with particularity pursuant to Federal Rule of Civil Procedure 9(b).  The fact that CLRA claims must meet a heightened pleading standard does not lead to the conclusion that a CLRA claim must fulfill all of the elements of a fraud tort claim.  This conclusion is consistent with the Court's previous finding that Defendant has not shown that a duty must be alleged in order to state a claim under either the CLRA or the Unfair Competition Law (UCL).  <u>See</u> August 6, 2003

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

1   Order at 9.

2        For this reason, Defendant's arguments that Plaintiffs have

3   failed to show disputed issues of material fact with respect to

4   the general principles of tort law governing fraud, rather than

5   the CLRA, are inapposite.  These arguments include whether

6   Defendant owed a duty to the initial purchasers of its cars,

7   whether that duty runs to used car purchasers, and whether

8   Defendant's acts were calculated to induce a false belief.

9   Defendant has also shown no grounds for the Court to reconsider

10  the conclusions in its previous order, namely that pure

11  omissions are actionable under the CLRA and that Plaintiffs who

12  purchased used cars have standing to bring CLRA claims, despite

13  the fact that they never entered into a transaction directly

14  with Defendant.

15       B.   Materiality

16       Defendant argues that Plaintiffs have not produced

17  sufficient evidence to raise a genuine dispute of fact as to

18  whether consumers would have considered the likely post-warranty

19  performance of the manifolds to be material.

20       In order to prove that non-disclosed information is

21  "material," Plaintiffs must be able show that "had the omitted

22  information been disclosed, one would have been aware of it and

23  behaved differently."  <u>Mirkin v. Wasserman</u>, 5 Cal. 4th 1082,

24  1093 (1993).  Materiality is judged by the effect on a

25  "reasonable consumer," and this standard applies to CLRA claims.

26  <u>Consumer Advocates</u>, 113 Cal. App. 4th at 1360. "[A]necdotal

27  evidence alone is insufficient to prove that the public is

28                                    10

likely to be misled" under the reasonable consumer standard.
<u>Haskel v. Time</u>, 965 F. Supp. 1398, 1407 (E.D. Cal. 1997) (citing
<u>William H. Morris Co. v. Group W. Inc.</u>, 66 F.3d 255, 258 (9th
Cir. 1995)).

Plaintiffs provide testimony from some class members that
they would not have bought the cars had they known of the
increased failure risk.  <u>See, e.g.</u>, Solomon Decl., Ex. 29, Alton
Dep. 90:8-24, 93:2-19.  Alone, this anecdotal testimony would be
insufficient to establish materiality.  However, Mr. Greenspan
also testified that a typical vehicle owner would not expect
this part to fail, and described the high cost of replacing
failed manifolds and the serious risk of engine failure.[3]  In
addition, Defendant's own ONP provided to certain retail owners
corroborates Plaintiffs' experts' testimony regarding the
significance of manifold failure.

Defendant argues that Plaintiffs' showing is insufficient
without direct evidence that reasonable customers choose which
cars to buy based on the reliability of particular components.
This type of evidence is not necessary in order for a reasonable
jury to conclude that a failure to disclose such heightened

---

[3]Defendant argues that Mr. Greenspan is not qualified to
offer an opinion about consumer expectations with regard to
manifolds because he is an auto mechanic, not a marketing
specialist.  <u>See</u> Defendant's Reply at 7 n.3.  However, Mr.
Greenspan's experience as an auto mechanic does allow him to
provide reliable opinion evidence regarding consumer
expectations about which auto parts will fail and which will
not.  His report does not purport to provide direct evidence
about exactly what car purchasers would have done had Defendant
disclosed the information.  Defendant's arguments go to the
weight rather than the admissibility of Mr. Greenspan's
testimony.

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

risks is material.  Because most manifolds do last the life of the engine, it is not surprising that manifold reliability is usually not a factor in the decision of which car to purchase. The fact that most consumers do not consider manifold reliability does not lead to the conclusion that the average consumer would not consider an increased rate of post-warranty failure to be material either to choice of car or price. Plaintiffs' evidence is sufficient to establish a dispute of fact regarding materiality.

C.   Causation and Damages

Defendant argues that a reasonable jury could not conclude that class representatives Chamberlan and Fok suffered damage "as a result" of Defendant's unlawful acts.  Cal. Civ. Code § 1780(a).  "Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof."  Wilens v. TD Waterhouse Group, Inc., 120 Cal. App. 4th 746, 754 (2003).

Plaintiffs rely on Mass. Mutual Life Ins. Co. v. Superior Court, 97 Cal. App. 4th 1282, 1292-94 (2002), for the proposition that causation can be proved through a finding of materiality.  In that case, the plaintiffs contended that the defendant's misrepresentations "would have been material to any reasonable person contemplating purchase" of certain insurance products.  97 Cal. App. 4th at 1293.  The court ruled that the CLRA's causation requirement did not render the case unsuitable for class treatment because, if the plaintiffs were successful in proving these facts, "the purchases common to each class

member would in turn be sufficient to give rise to the inference
of common reliance on representations which were materially
deficient." <u>Id.</u>  Plaintiffs point to the costs to Chamberlan
and Fok of their failed manifolds as a measure of damages.

Defendant argues that <u>Mass. Mutual</u> permits an inference of
reliance "only if a plaintiff can show that the allegedly
omitted information was material," and that Plaintiffs cannot do
so.  Def.'s Reply at 10.  Defendant is correct that a finding of
materiality is crucial to this case, but Plaintiffs do not
dispute this point of law.  As described above, Plaintiffs have
sufficient evidence to establish a dispute of fact as to
materiality.  Plaintiffs' inability to prove that the original
owners of Ms. Chamberlan and Mr. Fok's cars would have passed
along negative information about the manifolds goes to the
weight of the evidence that the jury has to consider.

Defendant contends that the named Plaintiffs must
provide evidence that they would have been financially
better off had they purchased different used vehicles.  As
Plaintiffs note, there is no authority for this
proposition.  The named Plaintiffs are able to show
specific damages incurred by the failure of their intake
manifolds.  This is sufficient to create a triable issue of
fact regarding damages.

For the foregoing reasons, the Court denies
Defendant's motion for summary adjudication of the named
Plaintiffs' CLRA claims.

D.  UCL Claims

Defendant also moves for summary adjudication of the named Plaintiffs' individual UCL claims, on the grounds that Plaintiffs have failed to raise a dispute of material fact as to whether Defendant's conduct was "unlawful, unfair or fraudulent."  Cal. Bus. & Prof. Code § 17200.

Plaintiffs' argument that Defendant's acts were "unlawful" rests on their underlying CLRA claims.  Because the Court finds that a dispute of material fact exists as to the CLRA claims, "unlawfulness" under the UCL is necessarily also a matter of disputed fact.  Likewise, as described above, the Court finds that Plaintiffs have shown some non-anecdotal evidence that Defendant's omission was "fraudulent."  Defendant's motion for summary adjudication of the named Plaintiffs' UCL claims is therefore denied.

II.  CLRA Claims of Certain Subsets of the Class

A.  Class Members Whose Manifolds Have Not Failed

Defendant moves for summary adjudication of the claims of class members whose manifolds have not yet failed, on the grounds that they have suffered no cognizable injury and, in the alternative, that Plaintiffs have failed to establish the amount of damages.

Cal. Civ. Code § 1780(a) allows an action to be brought by a consumer "who suffers any damage" as a result of acts in violation of the CLRA.  Such a consumer can then recover "[a]ctual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars."  Cal. Civ. Code § 1780(a)(1).  Although

14

the CLRA does not define "actual damages," in the context of common law fraud, California courts have defined "actual damages" to mean "those which compensate someone for the harm from which he or she has been proven to currently suffer or from which the evidence shows he or she is certain to suffer in the future."  <u>Saunders v. Taylor</u>, 42 Cal. App. 4th 1538, 1543 (1996).  Actual damages "are to be distinguished from those which are nominal rather than substantial, exemplary or punitive rather than compensatory, and speculative rather than existing or certain."  <u>Id.</u> at 1543-44.  Prevailing consumers under the CLRA may also obtain an injunction, restitution, punitive damages, and "any other relief the court deems proper." Cal. Civ. Code § 1780(a)(2-5).

    The plain language of the CLRA does not require that consumers suffer particular pecuniary losses in order to bring a CLRA claim and recover at least the statutory minimum, nor does Defendant cite any case to the contrary. Plaintiffs can establish some damage by the reasonable inference that the class members' plastic manifolds have suffered more degradation than manifolds made from aluminum or metal composite.  This showing is sufficient to meet the requirements for standing under the CLRA.  <u>Cf.</u> <u>Wilens v. TD Waterhouse Group, Inc.</u>, 120 Cal. App. 4th 746 (2003) (denying class certification in CLRA action where court could not presume that each class member suffered "any

**United States District Court**
For the Northern District of California

damage" due to allegedly unconscionable contract provision).

However, Plaintiffs' position that class members whose manifolds have not failed may recover compensatory damages beyond a share of the statutory minimum, absent evidence of specific losses, also lacks authority. On this point, Kagan v. Gibralter Savings and Loan is inapposite. There, the court refused to let a defendant "pick off" the prospective named plaintiff in a class action by providing an individual remedy to that plaintiff. 35 Cal. 3d 582, 593 (1984). In so doing, the court rejected the defendant's attempt to "equate pecuniary loss with the standing requirement that a consumer 'suffer [] any damage.'" Id. Kagan does not speak to the question of what constitutes "actual damages" for purposes of recovery under the CLRA.

In their supplemental brief regarding damages, Plaintiffs argue that they have provided evidence to show that class members' manifolds are "substantially certain" to fail before the end of the useful life of the car. See Hicks v. Kaufman & Broad Home Corp., 89 Cal. App. 4th 908, 923 (2001) (finding that plaintiff in action for breach of warranty need only show that product is substantially certain to malfunction during the useful life of the product); Microsoft Corp. v. Manning, 914 S.W.2d 602, 609-610 (Tex. App. 1995) (finding disk operating system with potential to destroy software constituted compensable

**United States District Court**

For the Northern District of California

injury under the Washington Consumer Protection Act).
Defendants maintain that <u>Hicks</u> and <u>Manning</u> do not apply to
products such as cars that do not have an indefinite useful
life.  <u>See</u> <u>Hicks</u> at 923 ("Foundations . . . are not like
cars or tires.  Cars and tires have a limited useful
life."); <u>Manning</u> at 609 (same).  Yet the reasoning of <u>Hicks</u>
and <u>Manning</u> applies equally well in situations where the
overall product, here a car, has a limited but long useful
life and a component has a defect that is substantially
certain to manifest itself before the end of that useful
life.[4]

Plaintiffs have offered some evidence, in the form of
Mr. Mesa and Dr. Kasbekar's testimony, that all or nearly
all of class members' manifolds will fail before the end of
the useful life of the car.  The fact that Dr. Kasbekar
admitted that for any given vehicle neither he nor Ford
could quantify how long the manifold would last, <u>see, e.g.,</u>
Supp. Swaney Decl., Ex. 3, Kasbekar Dep. 103:19-104:2, does
not negate his overall opinion that they will all fail

_____

[4]Defendant cites several unpublished cases in which courts
outside California have refused to apply <u>Manning</u> to cases where
defective automobile components have yet to malfunction.  <u>See,
e.g.,</u> <u>Gen. Motors Corp. v. Garza</u>, 2005 WL 154198 (Tex. Ct. App.,
Jan. 26, 2005).  None of the cases involve the CLRA, and they
are unpersuasive in light of the requirement to construe the
CLRA liberally.  <u>See</u> Cal. Civ. Code § 1760.  Moreover, one of
those cases recognized that plaintiffs might be allowed to
recover damages where resale value is reduced due to an
automobile defect that is "sure (or extremely likely) to
manifest itself at a future date."  <u>In re Gen. Motors Type III
Door Latch Litigation</u>, 2001 WL 103434 at *5 (N. D. Ill., Jan.
31, 2001).

prematurely.  Plaintiffs' evidence is sufficient to establish a dispute of material fact with respect to manifolds of class members that have not yet failed.

For these reasons, the Court denies Defendant's motion for summary adjudication of the claims of class members whose manifolds have not yet failed.  However, the potential recovery of this subset of the class will be limited unless Plaintiffs prove at trial that their manifolds are substantially certain to fail prematurely.

B.  Class Members Whose Manifolds Failed Before April 25, 2000

Defendant moves for summary adjudication of the claims of class members whose manifolds failed before April 25, 2000 on the grounds that Plaintiffs have not identified sufficient evidence to support their contention that Defendant's concealment of the problems with the manifolds tolled the statute of limitations.  See First Amended Complaint ¶ 26.

The CLRA provides that actions "shall be commenced not more than three years from the date of the commission" of a method, act or practice made unlawful by the act.  Cal. Civ. Code § 1783.  This statute of limitations runs "from the time a reasonable person would have discovered the basis for a claim." Mass. Mutual, 97 Cal. App. 4th at 1295.  The mere fact that a consumer's manifold failed does not necessarily mean that that person should have discovered Defendant's alleged non-disclosure at that time.

18

Defendant's evidence that two customers did suspect that Defendant was responsible for their defective manifolds prior April 25, 2000 shows that there may be a dispute of fact on this issue, but does not entitle Defendant to summary adjudication of the claims of this class subset.

C.   Class Members Whose Vehicles Were Originally Sold Before 1998

Defendant moves for summary adjudication of the claims of class members whose vehicles were originally sold before 1998 on the grounds that Plaintiffs' own expert evidence shows that Ford did not have any knowledge regarding the composite material that it should have disclosed to purchasers of retail vehicles.

Ford points to the testimony of Plaintiffs' expert Thomas Feaheny to support its contention.  See Swaney Decl., Ex. T, Feaheny Dep. 164:11-25 and 254:23-255:25.  He testified that it was not until 2001 that Defendant "recognized and committed to . . . taking corrective action," and that some of the "detailed specifications" for the composite material used "probably" changed over time.  Id. at 164:11-25.  Futhermore, upon being asked when Defendant should have informed retail customers about the problems with the manifolds, Mr. Feaheny replied, "Probably not at that time [when the Las Vegas taxi problem was reported], but probably as soon as 1998 or 1999 when they had had considerable information and they'd already been involved in making changes . . . ."  Id. at 255:7-17.  He

19

**United States District Court**
For the Northern District of California

later explained that it was possible that retail customers should have been informed sooner, and that he was "not totally sure exactly when everybody knew what."  Id. at 255:18-15.  Regardless of Mr. Feaheny's actual opinion, the question of what Defendant should have disclosed and when it should have done so is ultimately a decision for the jury to make as part of its materiality determination.  In light of the other evidence provided by Plaintiffs showing that Defendant had significant knowledge about the manifolds prior to 1997, the Court finds that Plaintiffs have raised a triable issue of material fact as to the claims of this subset of the class.

> D.   Class Members Whose Vehicles Were Originally Sold
> Before Ford had Experience with the Manifold Design

Defendant moves for summary adjudication of the claims of class members whose vehicles were sold before it had several years of experience with the particular manifold design.  Specifically, Defendant argues that Plaintiffs' experts admit that it could not have known of the problems with each version of the manifold until a sufficient track record was established for that manifold.

Defendant's reliance on brief excerpts from Plaintiffs' expert testimony misinterprets the evidence. For instance, Dr. Kasbekar's opinion was that Defendant failed to research fully the limitations of the non-metal composite material, resulting in a design he believes was "clearly inadequate for its intended purpose."  Swaney

**United States District Court**
For the Northern District of California

Decl. Ex. U, Kasbekar Rep. at 12; <u>see also</u> Ex. V, Feaheny Rep. at 5 ("because the engineers had not done their homework, they did not initially contemplate the failure mode at issue in this case.").  As explained above in Section II(C), Mr. Feaheny did not testify that Defendant had no material information about each successive manifold design until years after its introduction.  The reports as a whole provide at least some evidence that Ford should have known that its attempts to fix the problem would not work.  Overall, Plaintiffs have raised disputed issues of material fact sufficient to allow the jury to decide whether, and if so when, past experience with plastic manifolds constituted material information about later re-designs, and therefore should have been disclosed by Defendant.

However, Plaintiffs have failed to provide evidence that would allow a reasonable jury to conclude that Defendant concealed material facts from consumers when the non-metal composite manifolds were first introduced in June, 1995.  The earliest reported problems occurred in two fleet vehicles in November, 1995, and the earliest evidence that Ford engineers understood that this was a systemic problem is Mr. Beatham's June 6, 1996 estimate of significant manifold failure rates.  Solomon Decl. Ex. 5, Concern Detail.  Neither Plaintiffs nor their experts suggest that Defendant's failure to research fully was an act of concealment at the earliest stages.  For this

reason, the Court grants Defendant's motion for summary adjudication of the claims of members of the class who purchased their vehicles prior to June 6, 1996.[5]

IV.  Judgment on the Pleadings of UCL Claim

Defendant moves for judgment on the pleadings of the named Plaintiffs' claim on behalf of the general public, pursuant to the former "private attorney general" clause of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq.  Plaintiffs oppose this motion.

On November 2, 2004, the California electorate passed a ballot initiative known as Proposition 64.  This initiative amended the UCL to eliminate the ability of private individuals to bring actions on behalf of the general public.  The UCL now requires a private plaintiff seeking to bring an action for injunctive or restitutionary relief to establish that he or she "has suffered injury in fact and has lost money or property."  Cal. Bus. & Prof. Code § 17204.  Private plaintiffs who wish to maintain representative actions must satisfy both this standing requirement and the requirements for a class action in California Code of Civil Procedure § 382.  Id. § 17203.

Proposition 64 was silent on the question of whether these new standing requirements should be applied to pending cases filed before November 2, 2004.  Courts of

_____

[5]This holding does not apply to class members who, after June 6, 1996, purchased a second hand vehicle that was originally bought before June 6, 1996.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Appeal have addressed this issue multiple times, and the California Supreme Court granted review on this issue after oral argument on this motion was heard.  See, e.g., Californians for Disability Rights v. Mervyn's, LLC, previously published at 126 Cal. App. 4th 386 (2005), rev. granted, (Apr. 27, 2005); Branick v. Downey Savings and Loan Assoc., previously published at 24 Cal. Rptr. 3d 406, 413-417 (2005), rev. granted, (Apr. 27, 2005); Benson v. Kwikset Corp., previously published at 24 Cal. Rptr. 3d 683, 693-698 (2005), rev. granted, (Apr. 27, 2005); Bivens v. Corel Corp., previously published at 24 Cal. Rptr. 3d 847, 853-856 (2005), rev. granted, (Apr. 27, 2005); Lytwyn v. Fry's Elec., previously published at 25 Cal. Rptr. 3d 791, 812 (2005), rev. granted, (Apr. 28, 2005).[6]  The Courts of Appeal decisions therefore are no longer citable authority.  Cal. Rules of Court, Rules 976(d), 977(a). Accordingly, the Court does not rely on those decisions. When reviewing issues of State law, a federal court is "bound to follow the decisions of a state's highest court in interpreting that state's law."  Olympic Sports Prod. v. Universal Athletic Sales Co., 760 F. 2d 910, 912-13 (9th Cir. 1986) (citing Aydin Corp. v. Loral Corp., 718 F. 2d 897, 904 (9th Cir. 1983)).  A federal court should apply State law as it believes the highest court of the State

---

[6]Although these cases are no longer published authority, the Court notes that most of the cases held that Proposition 64 was retroactive, and that the reasoning of those cases is persuasive.

United States District Court

For the Northern District of California

1  would apply it.   See Jones-Hamilton Co. v. Beazer Materials

2  & Servs., Inc., 973 F.2d 688, 692 (9th Cir. 1992).

3       Plaintiffs urge that, in the absence of clear voter

4  intent, the Court should apply the usual presumption that

5  statutory enactments do not operate retroactively.   This

6  presumption was applied to voter repeal of a common law

7  right in Evangelatos v. Superior Court, 44 Cal. 3d 1188,

8  1214 (1988).   Defendant argues, however, that Proposition

9  64 falls squarely within a contrary rule on repeal of

10  statutes:   absent a savings clause, repeals of statutory

11  enactments must apply retroactively to pending cases.   Cal.

12  Gov. Code § 9606; see also Callet v. Alioto, 210 Cal. 65

13  (1930) (explaining application of § 9606 notwithstanding

14  customary presumption against retroactivity).   Plaintiffs

15  contend that the rule of retroactivity of the repeal of

16  statutes does not apply here because Proposition 64 amended

17  rather than repealed rights under the UCL, and because the

18  UCL is "derived from" common law.   Plaintiffs acknowledge

19  that California courts have repeatedly found that UCL

20  torts, despite their common law ancestry, cannot be equated

21  with the common law definition of unfair competition, see,

22  e.g., Bank of the West v. Superior Court, 2 Cal. 4th 1254,

23  1264 (1992), but Plaintiffs fail to rebut Defendant's

24  argument that as a consequence, the rule of retroactivity

25  of the repeal of statutes does apply here.   Nor do

26  Plaintiffs address Defendant's argument that § 9606 applies

27  to the repeal of part, as well as all, of a statute.   The

28

Court believes that the California Supreme Court will find Proposition 64 to be retroactive.

For this reason, the Court grants Defendant's motion for judgment on the pleadings of Plaintiffs' claim on behalf of the general public.  Defendant's argument that Plaintiffs cannot bring private attorney general claims under the UCL in federal court without meeting the requirements of Federal Rule of Civil Procedure 23 is moot. However, Plaintiffs may move to amend the complaint to allege that they meet the requirements of § 17204 as amended.

CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendant's motion for summary adjudication (Docket No. 250).  The Court GRANTS Defendant's motion for partial judgment on the pleadings (Docket No. 245), without prejudice to Plaintiffs' filing a motion for leave to file an amended complaint.

IT IS SO ORDERED.

Dated: 5/4/05                    /s/ CLAUDIA WILKEN
                                CLAUDIA WILKEN
                                United States District Judge