BRIAN C. ANDERSON (S.B. # 126539)
MATTHEW S. SHORS (*pro hac vice*)
MICHAEL E. STAMP (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone:    (202) 383-5300
Facsimile:    (202) 383-5414

MICHAEL F. TUBACH (S.B. #145955)
RANDALL W. EDWARDS (S.B. #179053)
STEVEN E. SWANEY (S.B. #221437)
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street, Suite 2600
San Francisco, CA 94111-3305
Telephone:    (415) 984-8700
Facsimile:    (415) 984-8701

Attorneys for Defendant
FORD MOTOR COMPANY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| SUSAN CHAMBERLAN, BRIAN CHAMPINE, and HENRY FOK, on behalf of themselves and all others similarly situated, and on behalf of the general public,<br><br>          Plaintiffs,<br><br>  v.<br><br>FORD MOTOR COMPANY and DOES 1 through 20, inclusive,<br><br>          Defendants | Case No.  C 03-02628 CW<br><br>**DEFENDANT FORD MOTOR COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR FINAL APPROVAL OF SETTLEMENT AND RESPONSE TO OBJECTIONS**<br><br>Time:      October 7, 2005<br>Date:      10:00 am<br>Location:  Courtroom 2<br><br>Judge:  Hon. Claudia Wilken |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.   SUMMARY OF THE FACTS ................................................................................... 2

    A.   The Litigation .................................................................................................. 2

    B.   The Parties' Settlement Negotiations ............................................................. 4

    C.   The Settlement Agreement ............................................................................. 5

    D.   Notice To Class Members Of The Proposed Settlement ................................ 7

II.  THE SETTLEMENT MEETS ALL REQUIREMENTS AND SHOULD BE APPROVED AS FAIR, REASONABLE, AND ADEQUATE ................................. 8

    A.   The Complexity, Expense, And Likely Extended Duration Of Further Litigation Favors Settlement. ...................................................................... 10

        1.   The Relief Sought Is Preempted By Federal Law ........................... 11

        2.   Plaintiffs Must Prove That Ford Had A Duty To Disclose .............. 12

        3.   Plaintiffs Must Prove That Ford Had An Intent To Deceive ........... 13

        4.   Persons Whose Manifolds Have Not Failed Have Not Suffered Any Legally Cognizable Damages ......................................................... 13

        5.   Plaintiffs Must Prove That Ford's Alleged Omissions Actually Caused Their Alleged Damages ....................................................... 14

        6.   Many Settlement Class Members Have Time-Barred Claims .......... 15

        7.   Aggregate Damages—The Relief Sought By Plaintiffs In The Chamberlan Trial—Is Unavailable ................................................. 15

    B.   Plaintiffs Would Have Had Difficulty Maintaining These Actions As Class Actions .............................................................................................. 17

        1.   An "All Owners" Class Definition Would Have Been Unsustainable In A Litigation Class ............................................... 17

        2.   A Class Action Cannot Be Asserted On Behalf Of A Fictitious "Composite Plaintiff" To Avoid Trial Manageability Issues ........... 18

        3.   Causation And Damages Could Not Be Proven On A Classwide Basis ............................................................................ 18

        4.   Variations In State Law Would Make Litigation Of A Nationwide Class Unmanageable ................................................... 19

i

1

2

## **TABLE OF CONTENTS**
### **(continued)**

Page

3      C.      The Settlement Confers A Valuable Benefit On The Settlement Class ...... 20

4      D.      The Stage Of The Proceedings And Extent Of Discovery Completed
               Favors Settlement ............................................................................. 21

5

6      E.      The Experience And Views Of Counsel Favor Settlement .......................... 22

7      F.      The Reaction Of Class Members To The Settlement Agreement
               Favors Settlement ............................................................................. 22

8   III.   THE OBJECTIONS TO THE SETTLEMENT ARE WITHOUT MERIT ........... 23

9      A.      Many "Objections" Are Invalid ......................................................... 23

10     B.      The Class Member Objectors Ignore That Settlement Requires
               Compromise ..................................................................................... 26

11

12     C.      Objections Seeking A Lifetime Warranty On An Engine Component
               Are Not Well-Taken .......................................................................... 28

13     D.      The Absence Of A Provision For A Recall Of Class Vehicles Does
               Not Make The Settlement Unfair Or Unreasonable ........................................ 30

14

15     E.      The Miscellaneous Objections Are Not Well-Founded ................................ 30

       CONCLUSION ................................................................................. 32

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Allison v. Citgo Petroleum Corp.,*
  151 F.3d 402 (5th Cir. 1998)......................................................................................16

5

6

*Am. Suzuki Motor Corp. v. Super. Ct.,*
  37 Cal. App. 4th 1291 (1995)......................................................................................14

7

*Amchem Prods, Inc. v. Windsor,*
  521 U.S. 591 (1997)............................................................................................ 16, 20

8

9

*Broussard v. Meineke Discount Muffler Shops, Inc.,*
  155 F.3d 331 (4th Cir. 1998)......................................................................................18

10

*Churchill Village, L.L.C. v. Beckwith Place Ltd. P'ship,*
  361 F.2d 566 (9th Cir. 2004)......................................................................................23

11

12

*Cimino v. Raymark Indus., Inc.,*
  151 F.3d 297 (5th Cir. 1998)......................................................................................16

13

*Class Plaintiffs v. Seattle,*
  955 F.2d 1268 (9th Cir. 1992)......................................................................................9

14

15

*Cotton v. Hinton,*
  559 F.2d 1326 (5th Cir. 1977)....................................................................................27

16

*Danney v. Jenkens & Gilchrist,*
  03 Civ. 5460 (SAS), 2005 U.S. Dist LEXIS 2507, at *65 (S.D.N.Y. Feb.
  18, 2005)....................................................................................................................23

17

18

*Dunk v. Ford Motor Co.,*
  48 Cal. App. 4th 1794 (Cal. Ct. App. 1990)................................................................29

19

*Ellis v. Naval Air Rework Facility,*
  87 F.R.D. 15 (N.D. Cal. 1980), aff'd, 661 F.2d 939 (9th Cir. 1981)...........................10

20

*Feinstein v. Firestone Tire & Rubber Co.,*
  535 F. Supp. 595 (S.D.N.Y. 1982)..............................................................................20

21

22

*Frank v. Eastman Kodak Co.,*
  228 F.R.D. 174 (W.D.N.Y. 2005)................................................................................23

23

*Georgine v. Amchem Prods. Inc.,*
  83 F.3d 610 (3d Cir. 1996) aff'd sub nom., Amchem Prods. v. Windsor,
  521 U.S. 591 (1997) ..................................................................................................19

24

25

*Gilbert v. Prudential-Bache Sec., Inc.,*
  Civ. A. No. 83-1513, 1987 U.S. Dist. LEXIS 1225, at *3 (E.D. Pa. Feb.
  18, 1987)....................................................................................................................24

26

27

28

iii

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

*Goodman v. Kennedy,*
  *18 Cal. 3d 335 (1976)* ...............................................................................*13*

4

*Hanlon v. Chrysler Corp.,*
  *150 F.3d 1011 (9th Cir. 1998)* ............................................................. *9, 20*

5

6

*Hicks v. Kaufman & Broad Home Corp.,*
  *89 Cal. App. 4th 908 (2001)* .........................................................................*14*

7

*In re Bridgestone/Firestone Inc. Tires Prods. Liab. Litig.,*
  *153 F. Supp. 2d 935 (S.D. Ind. 2001)* .........................................................*11*

8

9

*In re Fin. Partners Class Action Litig.,*
  *No. 82 C 5910, 1987 U.S. Dist. LEXIS 10746, at *2 (N.D. Ill. Nov. 18,*
  *1987)* ...............................................................................................................*24*

10

11

*In re Ford Motor Co Ignition Switch Prods. Liab. Litig.,*
  *174 F.R.D. 332 (D.N.J. 1997)* ......................................................................*19*

12

13

*In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.,*
  *966 F. Supp. 1525 (E.D. Mo. 1997)* .............................................................*12*

14

*In re Heritage Bond Litig.,*
  *MDL Case No. 02-ML-1475 DT, 2005 U.S. Dist. LEXIS 13555, at *11*
  *(C.D. Cal. June 10, 2005)* ..............................................................................*9*

15

16

*In re Integra Realty Res., Inc.,*
  *262 F.3d 1089 (10th Cir. 2001)* ...................................................................*24*

17

*In re Tri-State Crematory Litig.,*
  *215 F.R.D. 660 (N.D. Ga. 2003)* ..................................................................*16*

18

19

*In re Vitamins Antitrust Class Actions,*
  *215 F.3d 26 (D.C. Cir. 2000)* ........................................................................*24*

20

*In re Warfarin Sodium Antitrust Litig.,*
  *391 F.3d 516 (3d Cir. 2004)* .........................................................................*20*

21

22

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.,*
  *396 F.3d 922 (8th Cir. 2005)* ........................................................................*10*

23

*Kahn v. Shiley Inc.,*
  *217 Cal. App. 3d 848 (1990)* ........................................................................*14*

24

25

*Klay v. Humana, Inc.,*
  *382 F.3d 1241 (11th Cir. 2004)* ....................................................................*16*

26

*Kovich v. Paseo del Mar Homeowners' Assn,*
  *41 Cal. App. 4th 863 (1996)* .........................................................................*12*

27

28

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Lilly v. Ford Motor Corp.,*
    No. 00 C 7372, 2002 WL 84603 at *4-*5 (N.D. Ill. 2002)............................................11

*LiMandri v. Judkins,*
    52 Cal. App. 4th 326 (1997)............................................................................................12

*Lindsey v. Normet,*
    405 U.S. 56 (1972)..........................................................................................................16

*Linney v. Alaska Cellular P'ship,*
    Nos. C-96-3008 DLJ, C-97-0203 DLJ, C-97-0425 DLJ, C-97-0457 DLJ,
    1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), aff'd, 151 F.3d 1234
    (9th Cir. 1998) ..................................................................................................................9

*Mason v. Chrysler Corp.,*
    653 So.2d 951 (Ala. 1995)..............................................................................................12

*Mass. Mutual Life Ins. Co. v. Super. Ct. of San Diego,*
    97 Cal. App. 4th 1282 (2002)..........................................................................................15

*Namovicz v. Cooper Tire & Rubber Co.,*
    225 F. Supp. 2d 582 (D. Md. 2001).................................................................................11

*Officers for Justice v. Civil Serv. Comm'n of City and County of San
    Francisco,*
    688 F.2d 615 (9th Cir. 1982).....................................................................................passim

*Outboard Marine Corp. v. Super. Ct.,*
    52 Cal. App. 3d 30 (1975) ..............................................................................................13

*Rebney v. Wells Fargo Bank,*
    220 Cal. App. 3d 1117 (1990)..........................................................................................29

*Saunders v. Taylor,*
    42 Cal. App. 4th 1538 (1996)..........................................................................................14

*Taylor v. Am. Honda Motor Co., Inc.,*
    555 F. Supp. 59 (M.D. Fla. 1982) ...................................................................................13

*Valentino v. Carter-Wallace, Inc.,*
    97 F.3d 1227 (9th Cir. 1996)...........................................................................................16

*Warfarin Sodium Antitrust Litig.,*
    391 F.3d 516, 529-30 (3d Cir. 2004)...............................................................................20

*Walsh v. Ford Motor Co.,*
    807 F.2d 1000 (D.C. Cir. 1986) ......................................................................................20

*Wilens v. TD Waterhouse Group, Inc.,*
    120 Cal. App. 4th 746 (2003)..........................................................................................15

v

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Williamson v. Gen'l Dynamics Corp.,*
   *208 F.3d 1144 (9th Cir. 2000)*..........................................................................................12

4

5

## Statutes

6

*15 U.S.C. §§ 2301 et seq.* ....................................................................................................4

7

*49 U.S.C. §§ 30101 et seq.* ..................................................................................................11

8

*Cal. Civ. Code § 1761*........................................................................................................14

9

*Cal. Civ. Code § 1780*.................................................................................................. 13, 14

10

*Cal. Civ. Code § 3343*........................................................................................................14

11

12

## Other Authorities

13

*Restatement (Second) of Torts § 551, Comment a* ....................................................... 12, 13

14

15

## Rules

16

*Fed. R. Civ. P. 23*..............................................................................................................4, 8

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2        Ford Motor Company submits this memorandum in support of its Motion

3   for Final Approval of Settlement, and Response to Objections.  The Settlement Agreement

4   presently before the Court for final approval is the product of years of hard-fought

5   litigation and lengthy negotiation between the parties.  The terms of the Settlement

6   Agreement take into account the complexities and difficulties of proving plaintiffs' claims

7   against Ford and provide a reasonable recovery for the settlement class.  It is a

8   compromise negotiated at arm's length and in good faith in an effort to avoid the risks of

9   trial and further expense.  Accordingly, the Settlement Agreement provides a fair,

10  reasonable and adequate resolution of the claims of the Settlement Class, and the Court

11  should grant it final approval.

12        The Settlement Agreement calls for the creation of a nationwide settlement

13  class consisting of every person in the United States who owns or owned a vehicle

14  equipped with an all-composite intake manifold who has not voluntarily opted out of the

15  settlement or already received a similar warranty extension pursuant to a prior voluntary

16  Owner Notification Program initiated by Ford.  Pursuant to the Settlement Agreement,

17  each settlement class member will receive a seven-year, unlimited-mile warranty

18  extension on the all-composite intake manifold that plaintiffs claim to be defective.  The

19  Settlement Agreement places all members of the settlement class on an equal footing with

20  each other and with the owners that received extended warranty benefits in Ford's prior

21  programs.  This is a fair resolution that tracks plaintiffs' theory of the case—that class

22  members should have been included in Ford's prior voluntary programs.

23        The Settlement Agreement is a reasonable compromise that allows all

24  parties to avoid the risk of a complete loss.  It also allows class members to avoid the

25  numerous barriers to a classwide recovery that they would have to overcome either at trial

26  or on appeal.

27        Of the over two million class members, approximately 189 filed timely

28  objections and fewer than a thousand opted-out of the settlement.  Unsurprisingly, the

1  theme of most of the objections is that the settlement should have been more

2  advantageous to them.  The most common complaint is that the warranty coverage period

3  should be even longer than seven years; this complaint is aired by 69 people who own

4  class vehicles whose intake manifolds cracked after the vehicle was seven years old, and

5  hence are not eligible for benefits under the settlement.  But the test of a class action

6  settlement's fairness is not whether every class member in fact derives money from it, but

7  whether the benefits offered reflect a fair compromise between complete recovery of

8  every requested form of relief and no recovery.  Under the Settlement Agreement, every

9  class member receives longer warranty coverage on the intake manifold than he or she

10  would otherwise receive.  The fact that many class members will not obtain benefits under

11  that extended warranty because their intake manifolds last longer than seven years is not a

12  reason to reject the settlement, even if some of those class members experience manifold

13  cracking after their vehicles are more than seven years old.

14          In short, the proposed settlement reflects a fair compromise resolution of a

15  lawsuit whose outcome was uncertain, and that may well have resulted in no recovery

16  whatsoever in favor of any class member.

17                                         **ARGUMENT**

18  **I.      SUMMARY OF THE FACTS**

19          **A.      The Litigation**

20          Beginning in July 2003, several purported consumer class actions were filed

21  against Ford in different states concerning the alleged propensity for all-composite intake

22  manifolds installed in certain Ford, Lincoln, and Mercury vehicles to develop cracks in

23  the coolant crossover passage.  These putative class actions include:

24          ➢ *Bauske v. Ford Motor Company* (filed on July 13, 2001 in the District Court

25             of Harris County, Texas, 125th Judicial District, removed to the United

26             States District Court for the Southern District of Texas);

27          ➢ *McGettigan v. Ford Motor Company* (filed on October 11, 2002 in the

28             Circuit Court of Mobile County, State of Alabama);

2

➢ *Chamberlan v. Ford Motor Company* (filed on April 25, 2003 in the Superior Court of the State of California, County of Alameda, and removed on June 5, 2003 to the U.S. District Court for the Northern District of California); and

➢ *Rhea v. Ford Motor Company* (filed on February 16, 2005 in the District Court of Adair County, State of Oklahoma).

The parties to these actions vigorously litigated these cases.  In *Bauske v. Ford Motor Company*, the only action in which a court has reached final judgment, the plaintiffs lost.  In *Bauske* the plaintiffs asserted warranty and Deceptive Trade Practices Act claims against Ford—claims similar to those later asserted in the *Chamberlan*, *McGettigan*, and *Rhea* actions.  Following extensive discovery, which included interrogatories, document requests, and depositions of the named plaintiffs, Ford was granted summary judgment in March 2003.  The outcome in *Bauske* demonstrates that not all courts across the country would find plaintiffs' claims against Ford to be well-founded.

After *Bauske* was filed, but before summary judgment was granted in favor of Ford, the *McGettigan* case was filed in Alabama.  The parties proceeded with discovery, filed dispositive motions, and briefed class certification.  To this date, however, the court has not certified the *McGettigan* case as a class action or ruled on the dispositive motions.

While the *McGettigan* case was proceeding in Alabama state court, and shortly after summary judgment was entered in Ford's favor in the *Bauske* action, the *Chamberlan* action was filed in this Court asserting substantially the same allegations against Ford as in the *Bauske* case.  The *Chamberlan* case quickly became the most active of all the intake-manifold cases.  Ford has challenged the legal and factual sufficiency of this case, on both substantive and procedural grounds from its inception.  Ford removed the case to federal court and filed two motions to dismiss.  After the Rule 12 motions were resolved, plaintiffs and Ford engaged in lengthy discovery relating to class certification.  Ford opposed class certification, but following extensive briefing by the parties, and after

3

1    lengthy consideration by the Court, class certification was granted on September 8, 2004.

2    Ford then petitioned the Ninth Circuit for review of the Court's class certification order,

3    pursuant to Fed. R. Civ. P. 23(f).  Following supplementary briefing requested by the

4    Ninth Circuit, Ford's petition for review was denied.

5            Following class certification, the parties engaged in extensive merits

6    discovery in preparation for trial.  Between the *Chamberlan* and *McGettigan* cases, the

7    parties conducted 34 depositions of percipient witnesses, as well as depositions of nine

8    experts whom the parties designated as witnesses for trial in *Chamberlan*.  After the

9    conclusion of discovery, Ford filed a motion for summary judgment, which was granted in

10   part and denied in part, and a motion for judgment on the pleadings, which was granted.

11   The parties next turned to the extensive pre-trial preparation ordered by the Court.  This

12   included, for example, presenting competing trial proposals, jury instructions, and jury

13   verdict forms.  The parties also exchanged trial exhibits and identified their trial

14   witnesses.  As a result, the parties have an excellent understanding of how each side

15   intended to present its case at trial.

16           Finally, the *Rhea* action was commenced three months before trial was

17   scheduled to begin in the *Chamberlan* case.  Unlike *Chamberlan* or *McGettigan*, the *Rhea*

18   case is a putative nationwide class action, excluding California and Alabama, asserting

19   warranty claims against Ford under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301

20   *et seq*.

21           Collectively, the four cases related to the intake manifold provided Ford and

22   plaintiffs' counsel significant discovery and information about the strengths and

23   weaknesses of the case.  Several dispositive motions have been briefed, class certification

24   has been briefed in two different fora, dozens of depositions have occurred and, as this

25   Court is keenly aware, the *Chamberlan* case involved intense trial preparation.  In short,

26   the parties have gone through the entire litigation process; the only thing that has not

27   occurred is the actual trial of this case and any post-trial appeals.

28

4

1

**B.      The Parties' Settlement Negotiations**

2         After vigorously litigating the *Chamberlan* case for two years, the parties

3  began Court-ordered settlement discussions on April 20, 2005, one month before trial was

4  scheduled to commence.  The Court-ordered mediation, supervised by the Hon. Coleman

5  Fannin (Ret.), was followed by informal settlement discussions involving the continued

6  assistance of Judge Fannin.  These settlement discussions continued until the eve of trial.

7         On Friday, May 13, 2005, after three weeks of settlement negotiations, and

8  on the last business day before trial was scheduled to commence, the parties advised the

9  Court that they had reached a tentative agreement regarding the key points of a proposed

10  settlement.  The proposed settlement was presented to the Court for preliminary approval

11  on June 16, 2005, and on June 22, 2005 the Court issued an Order Preliminarily

12  Approving Settlement Agreement, Certifying Settlement Class, Appointing Settlement

13  Class Counsel, Setting Hearing on Final Approval of Settlement, and Directing Notice to

14  the Class.  In this order the Court, among other things, authorized Class Counsel and Ford

15  to move forward to effectuate the terms of the Settlement Agreement.  Since then, the

16  parties have diligently worked toward finalizing the settlement.

17

**C.      The Settlement Agreement**

18         The Settlement Agreement resolves all of the claims asserted by plaintiffs

19  against Ford in the pending *Chamberlan*, *McGettigan*, and *Rhea* actions.  For purposes of

20  settlement only, the parties propose certification of a "Settlement Class" consisting of

21  approximately two million persons residing in the United States who currently own or

22  lease, or previously owned or leased, various model/model year Ford, Lincoln, and

23  Mercury vehicles originally equipped with an all-composite intake manifold.  Specifically,

24  the class is defined as follows:

25         All persons residing in the United States who currently own or lease, or
   previously owned or leased, a 1996 through 2002 model-year Ford, Lincoln, or Mercury
26  vehicle equipped with a 4.6-liter, 2-valve V-8 engine having an all-composite air intake
   manifold as original equipment, other than vehicles which have already received an
27  extended warranty pursuant to a Ford Owner Notification Program action.  Specifically,
   class vehicles include those 1996-2001 Mercury Grand Marquis, 1996-2001 Ford Crown
28  Victorias, 1996-2001 Lincoln Town Cars, 1997 Mercury Cougars and Ford Thunderbirds

5

1   and Mustangs manufactured after June 24, 1997, 1998-2001 Ford Mustangs, and certain
2   2002 Ford Explorers that were equipped with the 4.6-liter, 2-valve V-8 engine.

3   Excluded from the class are: (1) Ford, its subsidiaries and affiliates, officers and directors; (2) the judge to whom this case is assigned and any member of the judge's immediate family; (3) persons who have settled with and released Ford from individual
4   claims substantially similar to those alleged in the Related Actions; and (4) persons who have previously timely and validly requested exclusion from the class certified in the
5   *Chamberlan* action.

6   The Settlement Agreement provides that the over two million estimated

7   members of the Settlement Class (except those very few who choose to opt out), involving

8   all current or former owners or lessees of approximately 1.8 million class vehicles, will

9   receive a retroactive extended vehicle warranty covering fatigue cracks in the all-

10  composite intake manifold on Class Vehicles which result in coolant leaks at the

11  crossover coolant passage.  The extended warranty coverage is for seven years from the

12  warranty start date (*i.e.*, the initial vehicle sale), without a mileage limitation.  If any

13  settlement class member experiences (or has already experienced) this condition within

14  seven years from the warranty start date, Ford will pay for a Ford, Lincoln, or Mercury

15  dealer to verify the condition and replace, at no cost to the vehicle owner, any such all-

16  composite intake manifold.  This extended warranty mirrors the coverage provided by

17  Ford to owners of police, limousine, and taxi vehicles, as well as retail 1996 and 1997

18  model-year Ford Mustangs, Ford Thunderbirds, and Mercury Cougars pursuant to Ford's

19  voluntary ONP 97M91.

20  Because the extended warranty program negotiated by the parties would be

21  retroactive, Ford will pay its dealers to reimburse settlement class members the actual

22  amounts paid by them to have the all-composite intake manifold replaced as a result of

23  fatigue cracks leading to coolant leaks at the crossover coolant passage, even if the failure

24  occurred prior to the effective date of the Settlement Agreement.  The covered costs

25  include the costs to replace the intake manifold, as well as any associated damage to the

26  remainder of the vehicle that was attributable to a failure of the intake manifold and could

27  not have been avoided by reasonable care of the settlement class member.  The class

28  members must provide proof of costs of repair (by an original receipt or copy of one) or a

6

demonstration to a Ford dealer of a replaced manifold.  If no receipt is available but a manifold replacement is confirmed by a dealer, the class member would be entitled to a set amount of compensation ($735).  In addition, Ford will pay reasonable attorney fees and reasonable actual expenses of no more than a negotiated amount, in addition to providing the direct class member benefits.

In recognition of the above benefits to the settlement class members, the Settlement Agreement provides that, following final approval by the Court and the expiration or exhaustion of all appeals in such manner as to affirm the Final Order or Judgment, the *Chamberlan*, *McGettigan*, and *Rhea* actions will be dismissed with prejudice.

**D.**     **Notice To Class Members Of The Proposed Settlement**

Ford began implementation of the terms of the settlement by starting the settlement class member notification process.  The Settlement Agreement requires that Ford, through Rosenthal & Company (the administrator of the settlement) provide the settlement class with notice of the proposed settlement in the following ways:

(1)     By publishing a Summary Notice of Pendency of Class Action, Proposed Settlement and Hearing in Parade Magazine and USA Weekend.

(2)     By providing a Mailed Notice of Pendency of Class Action, Proposed Settlement and Hearing via first-class mail to settlement class members who are current owners of class vehicles.  The mailing list for this notice was compiled by Ford in the same manner that it compiles mailing lists for voluntary owner notification programs conducted in the ordinary course of Ford's business, except that for the current-owner settlement class members residing in California, the mailing list used for the April 2005 notice in the *Chamberlan* action was used again.  If any mailed notice was returned, Rosenthal & Company directed it to the forwarding address, if available.

(3)     By making the contents of the Mailed Notice available via the Internet on a website maintained by Rosenthal & Company.  This Internet Notice will remain

7

posted on that website through January 1, 2009 and will be updated with

information mutually agreed by the parties until six months after the Effective Date

of the Settlement.

(4)     By providing settlement class members with a free telephone number to call

and the address of plaintiffs' counsel to which settlement class members may write

for information concerning the settlement and to receive reimbursement claim

forms.

For these and other settlement-implementation activities, Ford has incurred

large expenses thus far, not including attorney fees and the internal costs of Ford

personnel who have worked on these matters.

**II.      THE SETTLEMENT MEETS ALL REQUIREMENTS AND SHOULD BE APPROVED AS FAIR, REASONABLE, AND ADEQUATE.**

The Settlement Agreement that the parties ask the Court to finally approve

provides a retroactive seven-year, unlimited mile warranty on the all-composite intake

manifold to every member of the settlement class who does not voluntarily opt out.  Ford

will pay to provide free intake manifold repairs and reimbursements to settlement class

members and will also pay attorney fees to class counsel.  These are fair, reasonable, and

adequate terms.

The considerations that should inform a court's determination whether to

approve the settlement of a class action are well established.  Final approval of a

classwide settlement may only occur "after a hearing and on finding that the settlement,

voluntary dismissal, or compromise is fair, reasonable, and adequate."  Fed. R. Civ. P.

23(e)(1)(C).  The Court should consider the fairness, adequacy, and reasonableness of this

settlement by balancing many factors, which might include some or all of the following:

(1)     the risk, expense, complexity, and likely duration of further litigation;

(2)     the risk of maintaining class action status throughout the trial;

(3)     the amount offered in settlement;

(4)     the extent of discovery completed;

8

1        (5)     the stage of the proceedings;

2        (6)     the experience and views of counsel;

3        (7)     the presence of a governmental participant; and

4        (8)     the reaction of the class members to the proposed settlement.

*See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). The relative degree of importance of each of these factors varies according to the circumstances of each case and is dictated by the nature of the claims and the type of relief sought. *See Officers for Justice*, 688 F.2d at 625. Moreover, the factors must be considered in light of the Ninth Circuit's strong policy favoring settlements of complex class actions. *See Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (Ninth Circuit has "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."). The Court must consider the settlement as it has been presented to the Court and cannot re-write the Settlement Agreement for the parties. *See Officers for Justice*, 688 F.2d at 630 (the court is not "empowered to rewrite the settlement agreed upon by the parties" and "may not delete, modify, or substitute certain provisions"); *Hanlon*, 150 F.3d at 1026 ("The settlement must stand or fall in its entirety.").

        When reviewing these factors, the Settlement Agreement is entitled to a ***presumption of fairness*** because it was negotiated at length by experienced counsel after the conclusion of all discovery and on the last business day before trial was scheduled to commence. "[A] presumption of fairness arises where: (1) counsel is experienced in similar litigation; (2) settlement was reached through arm's length negotiations; [and] (3) investigation and discovery are sufficient to allow counsel and the court to act intelligently." *In re Heritage Bond Litig.*, MDL Case No. 02-ML-1475 DT, 2005 U.S. Dist. LEXIS 13555, at *11 (C.D. Cal. June 10, 2005); *Linney v. Alaska Cellular P'ship*, Nos. C-96-3008 DLJ, C-97-0203 DLJ, C-97-0425 DLJ, C-97-0457 DLJ, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998); *Ellis v.*

9

1   *Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th

2   Cir. 1981).  Counsel in this case are very experienced in trying consumer class actions and

3   have ably litigated the issues in this case.  If this settlement was not reached, this case

4   would have gone to trial.  There is no evidence that the settlement is motivated by fraud or

5   collusion.

6          As discussed below, seven of these eight factors favors settlement.  The

7   eighth factor, regarding governmental participation, is irrelevant.

8          **A.     The Complexity, Expense, And Likely Extended Duration Of Further
           Litigation Favors Settlement.**

9

10         The success of plaintiffs' claims in the *Chamberlan*, *McGettigan*, and *Rhea*

11  cases is very far from a foregone conclusion.  If the Settlement Agreement is rejected and

12  this litigation proceeds, settlement class members are uncertain to receive any benefit,

13  even after many years of litigation are concluded at great expense.  In deciding to settle

14  rather than continue with further litigation, both sides have weighed the relative risks and

15  rewards that would attend to continuing to litigate the *Chamberlan*, *McGettigan*, and *Rhea*

16  cases until final judgment, followed by the inevitable appeals initiated by one or both

17  sides.  This consideration must also be weighed by the Court in its fairness review.  *See*

18  *Officers for Justice*, 688 F.2d at 625.  Settlements of class actions are favored by courts

19  when they provide an immediate benefit to the class without the risk and expense involve

20  in continued litigation.  *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d

21  922, 933 (8th Cir. 2005) ("Weighing the uncertainty of relief against the immediate benefit

22  provided in the settlement").

23         While the substantive and procedural impediments to plaintiffs' case have

24  already been argued by Ford at various stages of the *Chamberlan* case, the Court of

25  Appeals has not yet had an opportunity to review many of this Court's decisions.  If this

26  case were to proceed through a trial and all appeals, it is possible that many members of

27  the California-only litigation class (which represents only a fraction of the nationwide

28  settlement class) would walk away with nothing.  A trial would proceed only at the risk of

10

1   foregoing any recovery at all.  And there are significant questions as to whether vehicle

2   owners in other states would ever be included in a class in *McGettigan* or *Rhea*, let alone

3   that they could ultimately prevail at trial and survive appeal.  This settlement, however,

4   ensures that all settlement class members will achieve the same benefit.

5          The following discussion identifies some of the most obvious vulnerabilities

6   in plaintiffs' claims.  Ford makes these points not to re-engage in litigation, but to

7   demonstrate that the litigation risks facing the class members are very real and that serious

8   questions exist as to whether class members would do better through further litigation.

9                  **1.      The Relief Sought Is Preempted By Federal Law.**

10         As Ford explained in previous briefing, a strong argument exists that claims

11   for injunctive relief in the form of a notice campaign or motor vehicle recall is preempted

12   by the National Highway Traffic and Motor Vehicle Safety Act, 49 U.S.C. §§ 30101 *et*

13   *seq.*  Motor vehicle recalls are within the exclusive province of the National Highway

14   Traffic Safety Administration ("NHTSA") and, because such a remedy is preempted by

15   the Safety Act, private plaintiffs cannot bring a claim under state law seeking injunctive

16   relief that would effectively result in a recall.  Any attempt to bypass this administrative

17   mechanism for obtaining a vehicle recall and instead seek a judicial remedy is inconsistent

18   with congressional purposes as stated in the Safety Act.  *See Lilly v. Ford Motor Corp.*,

19   No. 00 C 7372, 2002 WL 84603 at *4-*5 (N.D. Ill. 2002) (court-ordered motor vehicle

20   recall "would conflict directly with and frustrate the Safety Act"); *In re*

21   *Bridgestone/Firestone Inc. Tires Prods. Liab. Litig.*, 153 F. Supp. 2d 935, 947 (S.D. Ind.

22   2001) (comprehensive scheme for recalls in Safety Act "preempts a state-law-based

23   recall"); *Namovicz v. Cooper Tire & Rubber Co.*, 225 F. Supp. 2d 582, 584 (D. Md. 2001)

24   ("Congress has completely preempted the field with respect to the initiation and conduct

25   of motor vehicle and tire recalls.").  In light of this authority, there is significant doubt

26   whether a court-ordered notice campaign or recall would survive appellate review in

27   *Chamberlan* and whether the *McGettigan* or *Rhea* courts would grant such relief.

28

11

1

**2. Plaintiffs Must Prove That Ford Had A Duty To Disclose.**

2   As the Court is aware, Ford contends that an omission to disclose a

3   particular fact about the design limitations or anticipated durability of a single component

4   in a motor vehicle cannot be actionable unless the defendant owes the plaintiff a duty to

5   disclose. *See LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997). Therefore, to

6   prevail on their claims, plaintiffs must demonstrate that Ford owed them such a duty.

7   Under longstanding principles of tort law governing fraud, a failure to disclose even

8   material facts is not actionable unless the non-disclosing party owes the other party a duty

9   to disclose. *See, e.g.*, *Kovich v. Paseo del Mar Homeowners' Assn*, 41 Cal. App. 4th 863,

10  866 (1996); *LiMandri*, 52 Cal. App. 4th at 336; *Williamson v. Gen'l Dynamics Corp.*, 208

11  F.3d 1144, 1156 n.3 (9th Cir. 2000); *accord* Restatement (Second) of Torts § 551,

12  Comment a.

13  To establish that Ford owed them a duty to disclose, the plaintiffs in the California-

14  only class in *Chamberlan* would have to demonstrate that this case falls within one of the

15  four categories enumerated by California law: "(1) when the defendant is in a fiduciary

16  relationship with the plaintiff; (2) when the defendant had exclusive knowledge of

17  material facts not known to the plaintiff; (3) when the defendant actively conceals a

18  material fact from the plaintiff; and (4) when the defendant makes partial representations

19  but also suppresses some material facts." *LiMandri*, 52 Cal. App. 4th at 336 (internal

20  quotation marks omitted). Ford believes that, under the facts of this case, plaintiffs cannot

21  demonstrate that Ford falls into any of these categories. And courts in other

22  jurisdictions—where the vast majority of class members would have to litigate their

23  claims—have generally held that automakers do not have a duty to disclose potential non-

24  safety-related defects to consumers. *See, e.g., In re Gen. Motors Corp. Anti-Lock Brake*

25  *Prod. Liab. Litig.*, 966 F. Supp. 1525, 1535-37 (E.D. Mo. 1997) (analyzing to state

26  consumer protection laws, including CLRA); *Mason v. Chrysler Corp.*, 653 So.2d 951,

27  954-55 (Ala. 1995).

28  In addition, even if Ford had a duty to disclose every "material" fact about

12

its cars (and it manifestly did not) at most, this "duty" would have run to persons who—

unlike plaintiffs and virtually all class members—purchased their cars from Ford. *Cf.,*

*e.g.,* Restatement (Second) of Torts § 551 (duty of disclosure exists between "part[ies] to

a business transaction"); *Taylor v. Am. Honda Motor Co., Inc.*, 555 F. Supp. 59, 64 (M.D.

Fla. 1982) (refusing to recognize a "duty to disclose information to the public at large").

No matter how this Court and the courts in *McGettigan* and *Rhea* may have decided this

issue, duty to disclose is one of the most hotly-contested issues in this litigation and it was

certain to be appealed.

### 3.  Plaintiffs Must Prove That Ford Had An Intent To Deceive.

Under long-standing principles of tort law applicable to fraud claims,

plaintiffs must prove that Ford had an intent to deceive by making the allegedly deceptive

omission.  An omission is not actionable unless the defendant "knew the materiality of the

omitted matters," *e.g.*, *Goodman v. Kennedy*, 18 Cal. 3d 335, 347 (1976), and the

omission was "calculated to induce a false belief."  *E.g.*, *Outboard Marine Corp. v. Super.*

*Ct.*, 52 Cal. App. 3d 30, 37 (1975).  If courts did not require proof of intent to deceive, all

product manufacturers would face strict liability for failing to make unprecedented

disclosures based on a jury's after-the-fact determination that the undisclosed information

was material.  Ford hotly disputed that this could be the law, and there is no certainty that

plaintiffs would prevail on this issue on appeal or in any other trial court.  Since there is

no evidence that Ford intended to deceive anyone it is unlikely that plaintiffs could satisfy

this element of proof.

### 4.  Persons Whose Manifolds Have Not Failed Have Not Suffered Any Legally Cognizable Damages.

If this case were to proceed to trial, class members whose manifolds have not

suffered any legally cognizable damages could not obtain any recovery.  For example, the

claims of the California-only class in *Chamberlan* fail because the CLRA requires

"[a]ctual damages."  Cal. Civ. Code § 1780(a); *see also id.* § 1781(a).  Other states

similarly require actual damages to recover money at trial.  Thus, class members whose

13

1   manifolds have not failed have suffered no cognizable injury as a matter of law.

2   The risk that a product "may" fail in the future is not "actual damage[]."  Under

3   California law, for example, it is well settled that "actual damages" phrase means

4   compensation is available only for harm *actually* suffered.  *See Saunders v. Taylor*, 42 Cal.

5   App. 4th 1538, 1544 (1996).  If a product has not manifested a "defect," then the "*buyer has*

6   *received what he bargained for*" and does not have a claim.  *Hicks v. Kaufman & Broad*

7   *Home Corp.*, 89 Cal. App. 4th 908, 922-23 (2001) (emphasis added); *see also Am. Suzuki*

8   *Motor Corp. v. Super. Ct.*, 37 Cal. App. 4th 1291, 1294-95 (1995).  For this reason, "where

9   a plaintiff alleges a product is defective, proof that the product has malfunctioned is

10  essential to establish liability for an injury caused by the defect."  *Kahn v. Shiley Inc.*, 217

11  Cal. App. 3d 848, 855 (1990) (emphasis omitted).  Other jurisdictions likewise require that

12  an alleged defect manifest itself before any actual damages become cognizable.

13  Furthermore, persons whose manifolds have not failed would have to show

14  that their allegedly "defective" manifolds diminished the value of their vehicles.  Alleged

15  "consumers" suing under deceptive practices statutes cannot have damages for lost profits.

16  *Compare* Cal. Civ. Code § 1761(d) *with* Cal. Civ. Code § 3343(a)(4)(i) ("[L]ost profits

17  from the use or sale of the property shall be recoverable only if and only to the extent that

18  . . . [t]he defrauded party acquired the property for purpose of using or reselling it for a

19  profit.").  There is thus no authority that even hints—much less holds—that a jury may

20  find Ford liable to class members who have suffered no actual pecuniary harm.

21  Many—indeed, most—settlement class members never experienced an

22  intake manifold failure and therefore cannot prove actual damages.  Such claims have a

23  low probability of success at trial.

24  **5.    Plaintiffs Must Prove That Ford's Alleged Omissions Actually**
**Caused Their Alleged Damages.**

25

26  Class members also would have to prove causation—that is, that they

27  suffered damage "as a result" of an allegedly deceptive act in the original sale of their

28  cars.  *See e.g.,* Cal. Civ. Code. § 1780(a); *Wilens v. TD Waterhouse Group, Inc.*, 120 Cal.

14

App. 4th 746, 754 (2003); *Mass. Mutual Life Ins. Co. v. Super. Ct. of San Diego*, 97 Cal. App. 4th 1282, 1292 (2002).  Common reliance cannot be inferred to establish causation.

Individuals who bought their vehicles used cannot show that they relied on the alleged omissions, because there is no evidence supporting the assumption that prior owners of class vehicles would necessarily have passed along any information about the manifolds to subsequent purchasers.  Consumers purchase cars for many different reasons, and it is impermissible to infer that *all* would have changed their decisions based on a "problematic" manifold.  Accordingly, no presumption of reliance is proper.

### 6.    Many Settlement Class Members Have Time-Barred Claims.

Many settlement class members have time-barred claims.  If the settlement class member is among the large majority of individuals in the *Chamberlan* class whose vehicle was first sold before April 25, 2000, then that person's claim under the CLRA is presumptively untimely because Ford's alleged nondisclosure occurred more than three years before the lawsuit was filed.  Furthermore, any assertion that these claims should be tolled triggers the need for individualized inquiries regarding whether a given claimant discovered facts that would have formed the basis for the claim before April 2000.  Plaintiffs in *McGettigan* and *Rhea* would face similar statute of limitations problems based on the defined limitations periods for the relevant statutes and the delayed filing of complaints in those matters.

### 7.    Aggregate Damages—The Relief Sought By Plaintiffs In The Chamberlan Trial—Is Unavailable.

Aggregated damages may only be pursued if the damages at issue in the particular case are "common" to all class members and if the amount of damages can be calculated based on competent evidence pursuant to a cognizable legal theory of damages.  Aggregation of damages is not permitted when it would abridge the defendant's right to trial on the damages issue or would expand the potential liability by ignoring substantive requirements of the law.

"Damages," like any other element of a claim, must be proven at trial in a

15

1    manner that comports with the governing law.  If the existence, type, or amount of

2    purported damages vary claimant-by-claimant, then the Rules Enabling Act, the Due

3    Process Clause of the Fifth Amendment, and the Seventh Amendment entitle Ford to a

4    jury determination of the damages based on evidence that does not ignore individual

5    differences.  *See, e.g., Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (class

6    action device may not "abridge, enlarge or modify any substantive right"); *Lindsey v.*

7    *Normet*, 405 U.S. 56, 66 (1972); *Allison v. Citgo Petroleum Corp.* 151 F.3d 402, (5th Cir.

8    1998); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 312 (5th Cir. 1998).  Accordingly,

9    in cases in which damages questions are "individualized," those questions must be

10   severed from the "common" questions that may permissibly be tried at once—even if a

11   court has already certified a case as a class action.  *See, e.g., Klay v. Humana, Inc.*, 382

12   F.3d 1241, 1260 (11th Cir. 2004) (affirming class certification but requiring

13   "individualized damage inquiries"); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229

14   (9th Cir. 1996); *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 699 (N.D. Ga. 2003).

15          As repeatedly argued by Ford, damages questions in this case are not

16   "common" to all class members.  Rather, the question of how (if at all) each of the class

17   members was harmed by a particular *non-disclosure* at a particular time is inherently

18   individualized.  Damages will vary based upon whether a particular individual (1) had a

19   vehicle whose manifold failed; (2) bought a vehicle new or used; (3) would have

20   purchased another vehicle (and, if so, what kind of vehicle) if armed with a disclosure

21   about the manifold; (4) was reasonable in incurring repair costs; (5) took due caution after

22   discovering any problem (and therefore not exacerbating it and increasing the repair cost);

23   (6) had a manifold that failed within 7 years or 70,000 miles, as set forth in some

24   settlement class members' warranties; and (7) reasonably maintained the vehicle.

25          The class certification order in *Chamberlan* is not to the contrary.  There,

26   the Court expressly did not identify "actual damages" as one of the "common" questions

27   to be resolved in this trial.  There is no imaginable trial technique that would permit Ford

28   to test a particular class member's "actual damages" while still resolving every element of

16

1   every class member's CLRA claims in a unified trial seeking "aggregate damages."

2   Therefore, had plaintiffs been allowed to obtain aggregate damages, such an award almost

3   certainly would have been reversed on appeal.  These issues all create significant litigation

4   risk to the Settlement Class Members.

### B.   Plaintiffs Would Have Had Difficulty Maintaining These Actions As Class Actions.

7   Although the Court certified a one-state class in the *Chamberlan* action, it is

8   unlikely that plaintiffs could have properly maintained this action as a front-to-back class

9   action throughout the trial or that class certification would have been affirmed on appeal.

10  Moreover, no other class has been certified in any of the other intake manifold cases.  The

11  *McGettigan* court had not ruled in favor of class certification, and no motion was even

12  filed (let alone granted) in *Rhea*.  A nationwide class, such as the settlement class

13  proposed here, would have been unworkable.  Indeed, pending before the Court at the

14  time of settlement were motions that would have limited any class trial to a few predicate

15  issues, while deferring litigation of the myriad claimant-specific issues to second-stage

16  individual proceedings.  Further, had any class trial resulted in a final judgment against

17  Ford, Ford would have appealed the Court's class certification order.  With respect, Ford

18  submits that the Court's order would have been vulnerable to reversal on appeal.  The

19  non-California Settlement Class Members faced even greater risks associated with

20  certifying and maintaining a class action.  The significant risks set forth below favor

21  approval of the settlement.

### 1.   An "All Owners" Class Definition Would Have Been Unsustainable In A Litigation Class.

24  There is no proof that *all* owners of vehicles equipped with composite intake

25  manifolds are actually damaged.  The vast majority of vehicles have not experienced a

26  manifold failure and therefore have incurred no vehicle repair costs or other traditional

27  indicia of "actual damages."  Other class members' vehicles may have had a Ford-paid

28  manifold replacement (including an aluminum replacement) under warranty or a

17

replacement by a prior owner.  Because it would be improper and unfair to award a windfall judgment to uninjured class members simply because the named plaintiffs allege that they spent money to repair manifold failures, the class would have to be decertified on this basis alone.

### 2. A Class Action Cannot Be Asserted On Behalf Of A Fictitious "Composite Plaintiff" To Avoid Trial Manageability Issues.

Class certification could not be sustained throughout the trial because it would have soon become apparent that the evidence presented was not applicable to the entire class, but rather a collection of individual pieces of evidence, each of which is only relevant to a small fraction of the class.  Litigating class actions on behalf of fictional "perfect plaintiffs" has been deemed inappropriate in other class actions.  Class certification has been reversed by the Fourth Circuit where the district court ignored individual issues and instead permitted trial of a fictionalized "composite" plaintiff whose "claims" sustained those of the class. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998).

Decertification of this class was a significant risk in *Chamberlan*, either in this Court as trial developed or on appeal.  Certification issues loomed even larger for the non-California members of the Settlement Class, where no court had shown a willingness to permit a trial on a classwide basis.

### 3. Causation And Damages Could Not Be Proven On A Classwide Basis.

There is no evidence that class members were commonly harmed by Ford's supposed non-disclosure about the intake manifold.  Evidence regarding causation will vary widely among class members.  Whether Ford's nondisclosure of a material fact about the composite intake manifold caused a given class member to purchase, or pay more for, a class vehicle can only be litigated on a claimant-specific basis.

Evidence regarding the existence and amount of damages also differ widely among different class members.  Class members whose manifolds have worn out have

18

different kinds of damages claims than the large majority of class members whose manifolds are still functioning.  Class members whose manifolds have worn out have different costs of repair.  Claims for damages also raise individualized issues such as whether particular class members were reasonable in the repair costs they incurred; whether they failed to take due caution after discovering the problem (thus exacerbating it and increasing repair costs); whether they conducted improper maintenance, thereby contributing to the failure of the manifold; and whether their claims were covered by the 7-year/70,000 mile California emissions warranty, but they failed to seek coverage under the warranty.  Perhaps most fundamentally, evidence concerning what *other* vehicle, if any, a consumer would have purchased given a disclosure about the manifold, and how *that* vehicle's average repair costs compare to those the consumer actually purchased, cannot possibly be tried *en masse*.

> **4.**    **Variations In State Law Would Make Litigation Of A Nationwide Class Unmanageable.**

By resolving the claims of class members from all fifty states, this nationwide settlement class seeks to do what would be impossible in a nationwide litigation class.  The difficulties of litigating a nationwide class action are notorious.  Variations in state laws abound, creating conflict within the class and rendering a separate choice-of-law analysis necessary for the claims of each vehicle purchaser.  *See, e.g., Georgine v. Amchem Prods. Inc.*, 83 F.3d 610, 627 (3d Cir. 1996) (due process requires that a trial court "apply an ***individualized*** choice of law analysis to ***each plaintiff's*** claims" (emphasis added)), *aff'd sub nom., Amchem Prods. v. Windsor*, 521 U.S. 591 (1997); *In re Ford Motor Co Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997).  Performing a separate choice-of-law analysis for each vehicle owner or lessee would be an enormous and unmanageable undertaking.  Simply asserting a single Magnuson-Moss claim, as plaintiffs did in the *Rhea* case, does not eliminate the difficult choice of law problems that a court would face.  Magnuson-Moss Act claims are based on the substantive warranty law of the applicable states.  *Walsh v. Ford Motor Co.,* 807 F.2d

1    1000, 1016 (D.C. Cir. 1986); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595,

2    605 (S.D.N.Y. 1982).  And since the U.C.C. is not uniform, *e.g.*, *Walsh*, 807 F.2d at 1016

3    ("the Uniform Commercial Code is ***not*** uniform") (emphasis added), class certification

4    could not be maintained in a nationwide litigation class.

5              A nationwide settlement class does not suffer from the same problems as a

6    nationwide litigation class.  While a nationwide litigation class is typically unmanageable

7    due to variations in state law, a nationwide settlement class is acceptable because it avoids

8    these problems.  If a trial is not going to occur, a settlement class is not rendered

9    unmanageable and defeated by the presence of variations in state law.  *See Hanlon*, 150

10   F.3d at 1019, 1022-23 (certifying nationwide settlement class despite state law variations);

11   *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529-30 (3d Cir. 2004); *Amchem*, 521

12   U.S. at 620 ("Confronted with a request for settlement-only class certification, a district

13   court need not inquire whether the case, if tried, would present intractable management

14   problems . . . for the proposal is that there be no trial").

15            C.        **The Settlement Confers A Valuable Benefit On The Settlement Class.**

16            The Settlement Agreement provides valuable benefits to members of the

17   settlement class.  The Settlement Agreement provides that Ford will reimburse members

18   of the settlement class for "actual amounts paid by them . . . to have the all-composite

19   intake manifold replaced as a result of fatigue cracks" occurring during the first seven

20   years after the date of original sale.  The Settlement Agreement provides for a retroactive

21   7-year/unlimited mile warranty extension—meaning that even if a settlement class

22   member paid for repairs long ago, she may still obtain reimbursement as long as the repair

23   occurred within 7 years of the date of original vehicle sale.  The Settlement Agreement

24   also provides that Ford pay all costs of notifying settlement class members of the

25   Settlement Agreement and administering the Settlement Agreement's retroactive extended

26   warranty program.

27            These benefits place all settlement class members in a better position than

28   they would be in absent the settlement, and absent a victory in the litigation.  Settlement

                                              20

1    class members in almost all states currently are covered by a warranty providing that Ford

2    will repair or replace their intake manifold only if it malfunctions during the first 3 years

3    or 36,000 miles after initial sale.  California class members' warranty coverage period is 7

4    years/70,000 miles.   Hence, in almost all states, class members are receiving a warranty

5    that is more than twice as long as the one for which they paid when they bought their car.

6    In California, the mileage limitation currently governing their warranty is being

7    eliminated.

8        The proposed settlement gives consumer owners of the vehicles at issue the

9    most generous warranty coverage period that Ford has offered to any fleet owner of

10   vehicles with composite intake manifolds.  As the Court is aware, Ford extended the

11   warranty on composite intake manifolds in police cars and taxicabs to 7 years/unlimited

12   miles in view of the extreme stress to which such vehicles are subjected.  By this

13   settlement, Ford provides consumer owners of vehicles with these intake manifolds with

14   the same level of warranty coverage.  The meaningful benefits provided in the settlement

15   favor approval of the settlement.

16       **D.    The Stage Of The Proceedings And Extent Of Discovery Completed**
          **Favors Settlement.**
17

18       The claims of the settlement class members are ripe for settlement.  The

19   parties have engaged in extensive merits discovery in preparation for trial, conducting 34

20   depositions of percipient witnesses, as well as depositions of nine experts whom the

21   parties designated as witnesses for trial in *Chamberlan*.  The factual record has been fully

22   developed and nothing further can be gained by additional discovery.  The Court has ruled

23   on Ford's motion for summary judgment and a motion for judgment on the pleadings by

24   granting the motion for summary judgment in part and denying it in part, and granting the

25   motion for judgment on the pleadings.  The parties engaged in intensive pre-trial

26   preparation and presented competing trial proposals, jury instructions, and jury verdict

27   forms to the Court.  The parties also exchanged trial exhibits and identified their trial

28   witnesses.  The parties have an excellent understanding of all factual and legal issues

1  concerning the intake manifold cases.  This factor also weighs in favor of final approval of
2  the settlement.

3       **E.   The Experience And Views Of Counsel Favor Settlement**

4              Class counsel in this case are capable lawyers well-versed in class-action

5  litigation.  Class counsel in the *Chamberlan* case is associated with counsel in the *Rhea*

6  case and the lead trial counsel in the *Chamberlan* case is also counsel for the plaintiffs in

7  the *McGettigan* case.  All of these attorneys agree that the Settlement Agreement is fair

8  and provides valuable benefits to the settlement class.  The Court should credit the

9  opinion of counsel in this case when determining the fairness of this settlement.

10      **F.   The Reaction Of Class Members To The Settlement Agreement Favors
11            Settlement.**

12             The reaction of class members to the Settlement Agreement has been

13 generally positive.  There are over two million class members.  The vast majority of class

14 members received their notice and communicated no response.  Based on information

15 Ford has received as of the preparation of this brief, about 1,000 people communicated

16 their views about the settlement or about their vehicle ownership experience.  Viewed in

17 isolation, it might appear that large numbers of people are dissatisfied with their vehicles,

18 or with the terms of the settlement.  But the letters received must be read carefully and

19 placed in context of the 1.8 million member settlement class.

20             Twenty-two of the letters received were sent by people who are not in the

21 settlement class.  These letters were sent by people who own vehicles other than those at

22 issue in this lawsuit.  Although such communications demonstrate that intake manifold

23 issues are not confined to the vehicles at issue in this lawsuit, they are irrelevant to the

24 Court's consideration of the fairness of the proposed settlement.

25             Another 8 people who sent in letters will (whether they realize it or not)

26 receive benefits under the settlement.  These people will benefit from the settlement

27 because they experienced an intake manifold crack within the period of the extended

28 warranty that Ford is offering via this settlement.  These individuals include: Frances

22

1  Arredondo, Julia Bell, Ken Earhart, Tim Hallen, John and Margaret Koczynski, John

2  Miilo, Gordon Shaw, and Billy Winters.

3       The dissent rate is approximately 0.05%—or less than 1 in 2,000.  Courts

4  routinely approve classwide settlements with dissent rates far in excess of 0.05%.  Courts

5  have frequently recognized that dissent rates of 10% or 21% are acceptable.  *See Danney*

6  *v. Jenkens & Gilchrist*, 03 Civ. 5460 (SAS), 2005 U.S. Dist LEXIS 2507, at *65

7  (S.D.N.Y. Feb. 18, 2005) (noting that courts have frequently found the reaction of class

8  members to be in favor of settlement even where the dissent rate exceeds 10%); *Frank v.*

9  *Eastman Kodak Co.*, 228 F.R.D. 174, 185 (W.D.N.Y. 2005) (objection percentage of 21%

10  is acceptable); *Churchill Village, L.L.C. v. Beckwith Place Ltd. P'ship*, 361 F.2d 566, 577

11  (9th Cir. 2004) (objection rate of 0.05% is acceptable).  Because the low dissent rate

12  reveals near unanimous approval of the Settlement Agreement, the Court should grant it

13  final approval.

14  **III.**   **THE OBJECTIONS TO THE SETTLEMENT ARE WITHOUT MERIT**

15       Approximately two million current and former owners or lessees of class

16  vehicles will benefit from the Court's final approval of the Settlement Agreement.

17  Proportionally very few class members have lodged any objection to the settlement.  Most

18  of the objections are variants of a form letter found on an Internet web site containing

19  inaccurate and misleading information, which explains why most of the letters are

20  virtually identical.[1]

21      **A.**   **Many "Objections" Are Invalid.**

22       Many of the "objections" to the settlement are invalid because they are

23  asserted by persons who are either not a part of the class or have opted out of the class.

24  Persons who are not a member of the certified class have no legally protected interest in

25  the settlement and therefore have no standing to object.  *See In re Integra Realty Res.,*

26  

27  [1]      Many of the objectors copied a form letter obtained from the www.flamingfords.com website.  This website
purports to give details regarding the *Chamberlan* case and the Settlement Agreement.  In fact, the website contains

28  inaccuracies that may lead settlement class members to erroneously believe that Ford's liability cannot reasonably be
contested.

1   *Inc.*, 262 F.3d 1089, 1101 (10th Cir. 2001) (parties who opt out of a settlement "lacked

2   any legally protected interest that could support the 'injury in fact' element necessary to

3   demonstrate standing"); *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 28-29 (D.C.

4   Cir. 2000) (same holding); *In re Fin. Partners Class Action Litig.*, No. 82 C 5910, 1987

5   U.S. Dist. LEXIS 10746, at *2 (N.D. Ill. Nov. 18, 1987) (same holding); *Gilbert v.*

6   *Prudential-Bache Sec., Inc.*, Civ. A. No. 83-1513, 1987 U.S. Dist. LEXIS 1225, at *3

7   (E.D. Pa. Feb. 18, 1987) (individual "plainly lacks standing to object, since he opted out

8   of the class").  "Objections" asserted by the following individuals should therefore be

9   disregarded by the Court:

10  - **Michael Linnenkugel:**  Mr. Linnenkugel states that he owns a 1996 Ford

11      Mustang.  1996 Ford Mustangs are not class vehicles and Mr. Linnenkugel

12      is not a member of the settlement class.

13  - **Rex Vaughn:**  Mr. Vaughn states that he owns a 1996 Mercury Cougar.

14      1996 Mercury Cougars are not class vehicles and Mr. Vaughn is not a

15      member of the settlement class.

16  - **J. Ryan Kemmer:**  Mr. Kemmer states that he owns a 1997 Ford Crown

17      Victoria Police Interceptor.  1997 Ford Crown Victoria Police Interceptors

18      are not class vehicles and Mr. Kemmer is not a member of the settlement

19      class.  In fact, Mr. Kemmer's vehicle is already subject to a seven-year,

20      unlimited mile extended warranty.

21  - **Elizabeth Majors:**  Ms. Majors states that she owns a 1997 Ford

22      Thunderbird  that experienced a cracked intake manifold that caused

23      significant engine damage.  Ms. Major's 1997 Ford Thunderbird was

24      manufactured prior to June 25, 1997, (Declaration of Alan L. DeGraw ¶ 7,

25      (attached as Exhibit A)) and therefore it is not a class vehicle and Ms. Major

26      is not a member of the settlement class.

27  - **James Alexander, Richard Bailey, Jerry Kaye, Ruth E. Rivera Pacheco,**

28      **Donald Claybaugh, and Barbara and Reginald Moody:**  Messrs.

24

Alexander, Bailey, Claybaugh and Kaye, Ms. Pacheco, and Mr. and Mrs. Moody state that they each separately own 1996 Ford Thunderbird vehicles. 1996 Ford Thunderbirds are not class vehicles and Messrs. Alexander and Kaye are not members of the settlement class. Moreover, as Mr. Alexander acknowledges, these vehicles are already subject to a seven-year, unlimited mile extended warranty by Ford's Owner Notification Program 97M91.

- **Brian Yee, Ronald Dodson, Richard Bailey and Andrew Westphal:**
  Messrs. Yee, Dodson, Bailey and Westphal state that they each separately own 1996 Ford Mustang vehicles. These vehicles are not class vehicles. Therefore Messrs. Yee, Dodson, and Westphal are not members of the settlement class. Moreover, as Mr. Yee acknowledges, his intake manifold is already subject to a seven-year, unlimited mile extended warranty.

- **Carol Faddis:** Ms. Faddis states that she owns a 1997 Ford Thunderbird that she purchased on February 22, 1997. Because this 1997 Ford Thunderbird was manufactured prior to June 25, 1997 (*see* Declaration of Alan L. Degraw ¶ 10), Ms. Faddis does not own a class vehicle and she is not a settlement class member.

- **Christel Mancuso:** Ms. Mancuso states that she owns a 1997 Ford Thunderbird. Because Ms. Mancuso's 1997 Ford Thunderbird was manufactured prior to June 25, 1997 (*see* Declaration of Alan L. DeGraw ¶ 9), it is not a class vehicle and Ms. Mancuso is not a member of the settlement class.

- **Mark Williams:** Mr. Williams states that he owns a 1997 Ford Mustang GT. Because Mr. Williams's vehicle was manufactured before June 25, 1997 (*see* Declaration of Alan L. DeGraw ¶ 5), it is not a class vehicle and Mr. Williams is not a member of the settlement class.

- **Roberto Sacal:** Mr. Sacal states that he owns a 1997 Ford Mustang GT. Because Mr. Sacal's vehicle was manufactured before June 25, 1997 (*see*

25

1    Declaration of Alan L. DeGraw ¶ 6), it is not a class vehicle and Mr.

2    Williams is not a member of the settlement class.

3    • ***Phillip R. Arnoldy, Paul Ringgenberg, Joel Carpenter, and Shirley and***

4    ***Peter Lakatos:*** Messrs. Arnoldy, Ringgenberg, and Carpenter, and Mr. and

5    Mrs. Lakatos, request to be excluded from the class and therefore have no

6    basis to object to final approval of the Settlement Agreement.

7    **B.    The Class Member Objectors Ignore That Settlement Requires Compromise.**

8

9    Approximately 189 Settlement Class Members out of 2 million (or roughly

10   0.009%) lodged objections to the proposed settlement.  In the main, they objected to the

11   seven year limitation on the extended warranty that Ford is offering all consumer

12   purchasers under the settlement.  They contend that the warranty coverage period should

13   be longer—perhaps indefinite.  Many of these people own 1996 or 1997 model year

14   vehicles whose intake manifolds cracked after the vehicles were more than 7 years old

15   and, hence, their coverage benefit of the seven-year extended warranty in the settlement

16   does not entitle them to reimbursement of their repair costs.

17   These class members' objections to the proposed settlement are based on a

18   superficial, but understandable, practical analysis.  Their claims will be released under the

19   settlement even though they allegedly experienced intake manifold failures after such

20   lengthy performance that Ford's seven-year extended warranty will not cover the repair

21   costs.  In their view, the warranty should be even longer than the one Ford has agreed to

22   provide—perhaps covering intake manifolds for ten years, or for an unlimited period of

23   time, so that they may receive a reimbursement for the intake manifold problem that

24   occurred in their vehicles after the seven year mark.

25   But the test of a settlement's fairness is not whether it makes each and every

26   class member happy, or whether it puts money into the pocket of each class member as if

27   plaintiffs' prevailed on all of their requested relief.  Instead, the test of the settlement's

28   fairness is whether it reflects a reasonable compromise resolution of the claims asserted—

26

1   whether it falls somewhere in between what the class members would have received if

2   plaintiffs had won the case through litigation, and where they would have been situated

3   had Ford won.  "[T]he very essence of a settlement is compromise, 'a yielding of

4   absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Service*

5   *Comm'n of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (quoting *Cotton v. Hinton*,

6   559 F.2d 1326, 1330 (5th Cir. 1977)).

7          Against this test, the settlement is plainly reasonable, even though it does

8   not satisfy all class members.   It puts each and every class member in a better position

9   that he/she would have been in absent the settlement because it extends the warranty

10  coverage period of every class member.  The fact that the settlement does not provide

11  infinite warranty coverage is not a reason to reject the settlement as unreasonable.  As the

12  Court may recall, the core theory of plaintiffs' case (which they would have advanced at

13  trial) was that Ford acted unfairly by not giving consumer owners of vehicles with

14  composite intake manifolds with the 7 year/unlimited mileage extended warranty it gave

15  to police and taxi owners.  Plaintiffs were not planning to advocate at trial that Ford was

16  legally obliged to provide unlimited warranties for intake manifolds.  They did not

17  contend that Ford was required to pay to replace intake manifolds whenever they wore

18  out.  They were going to argue that Ford should have provided for consumer owners the

19  same extended warranty that Ford gave to fleet owners— in other words, a 7-

20  year/unlimited mileage warranty.

21         The proposed settlement gives class members the warranty coverage that

22  plaintiffs sought at trial.  Class members whose vehicles are less than 7 years old will (if

23  the settlement is approved) receive coverage up to the 7-year mark.  Class members

24  whose vehicles are more than 7 years old will receive reimbursement of intake manifold

25  repair costs if their manifold failed during the first 7 years.[2]

26  ────────────────────
[2]      One objector has an incorrect understanding of the Settlement Agreement.  Mr. Jerry Kaye apparently
27  believes that the Settlement Agreement should not be finally approved because it is comprised of an "incomplete
    class."  He would apparently include "*all* 4.6L V-8 engines with composite intake manifolds" within the class.  In
28  fact, the Settlement Agreement would create a seven-year, unlimited mile warranty extension for all 4.6L V-8
    engines with composite intake manifolds, except that it excludes those vehicles that are already subject to a seven-

                                            27

It is not a valid criticism of the settlement to note that the settlement does not reimburse vehicle owners for intake manifold failures that occur after their vehicles are seven years old.  As Ford has steadily maintained, vehicle parts (including intake manifolds) do not last forever.  Cars wear out.  That is why there are automobile repair shops.  If car manufacturers were required to repair everything that goes wrong with a car forever, cars wo uld be far more expensive than they are today.  Hence, a settlement that offers a seven year/unlimited mileage warranty for intake manifolds is reasonable, even though it means that some vehicle owners may not be reimbursed for the cost of their intake manifold repairs.

Taken in this context, it is clear that the "true" objectors' comments should not be allowed to derail a settlement that offers benefits to most class members that they are unlikely to achieve otherwise.  Many of the objectors start from the premise that the substantive allegations are unquestionably true and assume that plaintiffs would recover at trial with no risk of losing.[3]  But as explained above, plaintiffs' allegations have been vigorously contested and success at trial and on any subsequent appeal is far from certain.  The objectors' zeal for continued litigation must be tempered by the recognition that settlement provides some recovery whereas a loss at trial or on appeal might leave class members with nothing.  *Officers for Justice*, 688 F.2d at 624.

**C.     Objections Seeking A Lifetime Warranty On An Engine Component Are Not Well-Taken.**

The most common objection is that the extended warranty provided by the settlement should not be limited to seven years and unlimited miles but should provide for repair or replacement of all intake manifolds whenever they may fail. One objector, Mr. Cushman asserts that the settlement is unfair because, according to him, "it seems clear

---

year, unlimited mile Owner Notification Program.

[3]      *See, e.g.*, Objections of Mayberry ("[f]rom just a quick online study, it seems evident that the manifolds tend to fail"), Holtan ("[f]rom what we read, Ford knew as early as 1995 that this part was deficient"), McClennan ("Ford must have know it was a design problem"), Cushman ("it seems clear that Ford acknowledges that intake manifolds of this type are inherently defective"), McGee (stating that "information" indicates that Ford "knew" her manifold to be a "problem"), and Haller (asserting that the lawsuit is itself evidence that the manifolds are defective).

1    that Ford acknowledges that intake manifolds of this type are inherently defective."

2    Apparently, Mr. Cushman would have preferred to receive an unprecedented 11

3    year/unlimited mile warranty.  Mr. Cushman's objection is without merit.  As the Court is

4    aware, Ford has vigorously contested the notion that the all-composite intake manifolds

5    are inherently defective and it was prepared to present substantial expert testimony at trial

6    proving the lack of any defect.   These objectors complain that the seven-year, unlimited

7    mile extended warranty severely limits Ford's liability.  However, those objectors lose

8    sight of the fact that the seven-year, unlimited-mile warranty extension represents a very

9    substantial expansion of Ford's commitment to repair vehicles.

10           Fairness of a class action settlement is not dependent upon all class

11   members obtaining the same benefits.  Different class members have different

12   circumstances, and the class action settlement may be more or less valuable to class

13   members depending upon their individual circumstances.  For example, in *Dunk v. Ford*

14   *Motor Co.*, 48 Cal. App. 4th 1794 (Cal. Ct. App. 1990), the court weighed the relevant

15   factors, including the nature of the claims and the risks should the claims be fully

16   litigated, and approved a settlement notwithstanding that many class members would

17   realize no benefit as a practical matter.  The settlement agreement in *Dunk* provided that

18   class members would receive a coupon redeemable for $400 off the price of a Ford car or

19   light truck.  The court found that the settlement was fair and of value to the class, even

20   though not all class members would have an interest in or the means with which to take

21   advantage of the coupon.  *Id.* at 1802-05; *see also Rebney v. Wells Fargo Bank*, 220 Cal.

22   App. 3d 1117, 1125, 1139-40 (1990) (approval of class action settlement under which

23   certain former-customer class member received no benefit, the court noting that

24   "[d]efense judgments were hardly beyond the realm of possibility").

25           Ford's willingness to provide coverage for the intake manifold for seven

26   years and unlimited miles was a significant concession, since this settlement exactly

27   tracks plaintiffs' theory of the case.  Ford strongly contested plaintiffs' theory on the

28   ground that it would have the effect of obliterating commonly-understood time/mileage

29

1  limitations on warranty coverage.  The expanded warranty coverage now made available

2  under the settlement far exceeds the reasonable expectations of consumers that derive

3  from common motor vehicle warranty practices.  In fact, the expanded warranty coverage

4  mirrors what the Court indicated it would be inclined to award as injunctive relief if

5  plaintiffs succeeded at trial.  *See* Transcript of Proceedings at 8:1-8 (May 6, 2005 ) ("[M]y

6  inclination would be to say that I would enter injunctive relief on that if the jury found

7  liability and order Ford to pay for the replacement manifold of anybody whose manifold

8  fails within seven years of the car's manufacture or 70,000 miles.  And to replace it at

9  the—for free.  Or even replace it if it's shown to be leaking or something like that.

10  Similar to the O[N]P  program.").  For these reasons, the terms applicable to the extended

11  warranty and reimbursement benefits are entirely fair and reasonable.

**D.      The Absence Of A Provision For A Recall Of Class Vehicles Does Not Make The Settlement Unfair Or Unreasonable.**

14        Some objectors assert that the settlement should provide for a nationwide

15  recall of class vehicles.[4]  This objection, like others, overlooks that in assessing the

16  fairness of a class action settlement the test is not whether the recovery meets the

17  plaintiffs' greatest expectations, but whether the settlement is fair and reasonable under all

18  the circumstances.  Settlement requires "an abandoning of highest hopes."  *Officers for*

19  *Justice*, 688 F.2d at 624.  As discussed above, a motor vehicle recall is not a remedy that

20  is available to the plaintiffs in a judicial proceeding.  It was therefore completely

21  reasonable for plaintiffs not to insist on this remedy as a condition to any settlement

22  agreement.

**E.      The Miscellaneous Objections Are Not Well-Founded.**

24        One individual, Mr. Nathaniel Goldman, objects for no other reason than

25  that the replacement of the intake manifold must be done by a Ford dealer.  But this is an

26  inherent feature of motor vehicle manufacturer warranty service and will come as no

27  surprise to any vehicle owner.  Moreover, Mr. Goldman's objection is not necessarily

28

---

[4]      *See* Objections of Aldinger, Arnold, Stringer, and Wells.

30

1   true.  In certain circumstances a repair may be performed by a non-Ford dealer.  For

2   example, if emergency repairs are needed and a Ford dealer is not available, the settlement

3   class member will be reimbursed for repairs performed by a non-Ford dealer upon

4   application to a dealer with an original supporting receipt.  Similarly, if repairs have

5   already been performed by a non-Ford dealer prior to settlement, the settlement class

6   member may present the original receipts for those repairs to a Ford dealer for

7   reimbursement.  These are plainly reasonable provisions.

8          Another individual, Mr. Charlie Stringer, evidently does not understand that

9   the intake manifold presently installed on his vehicle is the redesigned composite

10  manifold with aluminum water crossover.  His repair took place in March 2005—long

11  after Ford dealers ceased using all-composite manifolds as replacement intake manifolds.

12  Therefore, contrary to Mr. Stringer's belief, it is extraordinarily unlikely that his new

13  intake manifold will crack at the water crossover, no matter how long he keeps it.

14         Finally, another individual, Ms. Janet Wells, does not offer any specific

15  objection to the settlement.  Rather, she expresses her disappointment with the original

16  intake manifold installed in her vehicle and asks that her experience be considered.  She

17  apparently has no specific objections to the fairness of the settlement.

18         None of these objections are well-founded.  Although no settlement

19  agreement could possibly meet the idiosyncratic preferences of all settlement class

20  members, the low dissent rate by objectors indicates that the Settlement Agreement is

21  satisfactory to the vast majority of all settlement class members.

22

23

24

25

26

27

28

1

## CONCLUSION

2          For the foregoing reasons, Ford respectfully requests that the Court grant

3   final approval of the Settlement Agreement.

4

5                                          Respectfully submitted,

6   Dated: September 27, 2005              O'MELVENY & MYERS LLP

7
                                           By:      */s/ Brian C. Anderson*
8                                                Brian C. Anderson
                                                 Attorneys for Defendant
9                                                FORD MOTOR COMPANY

10  SF1:602706.1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28